Vincent CEFALU and Frances P. Cefalu,
Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 17714.

United States Court of Appeals
Fifth Circuit.

Feb. 29, 1960.

deQuincy V. Sutton, Meridian, Miss., for petitioners.

C. Guy Tadlock, Joseph Kovner, Robert N. Anderson, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Howard A. Heffron, Acting Asst. Atty. Gen., Rollin H. Transue, Sp. Atty., Arch M. Cantrall, Chief Counsel, I. R. S., Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Dept. of Justice, for respondent.

Before TUTTLE, CAMERON and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

The Court is asked to review a Tax Court decision upholding income tax deficiencies and fraud penalties levied by the Commissioner of Internal Revenue against petitioners Vincent and Frances P. Cefalu for the years 1943–1947.[1] Two questions are presented: (1) Did the Tax Court properly apply the net worth method of computing unreported income? (2) Does the evidence support the imposition of fraud penalties against the taxpayers? We affirm the holding of the Tax Court.

Vincent Cefalu emigrated from Italy to the United States in 1912 when he was sixteen years old. He began work as a barber in Baton Rouge, Louisiana, at a salary of $15 a week. In less than a year he owned the barber shop and had two barbers working for him. Soon he bought another barber shop. In a short while he began handling tobacco products, cosmetics, and barber supplies. In 1924 Cefalu organized the Universal Distributing Company, Inc., to take over his tobacco business and supply business. Cefalu owned all of the capital stock. The corporation acquired a barroom and also sold package liquor. Its income tax returns showed a modest profit each year for the years 1935–1941. Universal did not declare or pay any dividends, and none of its officers received a salary. About 1940 the corporation began operating music box routes. At this time Universal acquired a number of cigarette-vending machines and other coin-operated machines. In 1941 Universal was liquidated and its assets and liabilities transferred to Cefalu.

After liquidation of the corporation, Cefalu organized the Universal Distributing Company as a sole proprietorship. Since he was still an alien and could not secure a liquor license, the business was operated in the name of R. M. Maggio, his brother-in-law. Maggio was to receive a share of the profits plus a salary. From 1943 to 1945 Maggio received a weekly salary of $25. He received a bonus of $300 in 1943 and $1000 in 1944.

Maggio reported the income and expenses of Universal Distributing Company on his and his wife's return for the years 1943–1945. Maggio did not prepare the returns nor have them prepared; Cefalu had the returns prepared for Maggio's signature. The returns showed a net profit for each year. Cefalu did not report any income from Universal Distributing Company on his individual return for 1943–1945. His individual returns showed a net profit of $4,000.20 for 1943, $5,239.22 for 1944, and $10,666.74 for 1945. He paid also an adjusted amount that was assessed against him. The adjusted return did not reflect the income and expenses of Universal Distributing Company.

December 31, 1945, Cefalu organized the Cefalu Distributing Company, a partnership consisting of three of his children, Sam, Bertie Lou, and Joe C., to take over the entire assets and liabilities of Universal Distributing Company. The three children put no capital into the partnership but did perform certain services. No consideration was paid to Maggio for these assets and liabilities. Cefalu had complete charge of the partnership business. The children worked in the business but understood that it belonged to their father. In a letter dated January 18, 1946, Cefalu informed the American Tobacco Company that the Cefalu Distributing Company was the

---

1. Vincent Cefalu filed an individual return for 1943–1947. Frances Cefalu, who had no separate income, filed an individual return for 1945–1947. The taxpayers executed timely consents extending the period for assessments until June 30, 1952.

same as Universal Distributing Company; that "the assets and liabilities are the same and ownership has not changed". March 29, 1946, Cefalu advised the Collector of Internal Revenue at New Orleans, Louisiana that Cefalu Distributing Company had acquired the business of Universal Distributing Company. July 14, 1947, Cefalu guaranteed R. J. Reynolds Company that he would pay at maturity the purchase price of all goods sold to Cefalu Distributing Company.

The partnership return filed by Cefalu Distributing Company showed a net loss of $624.56 for 1946 and a net profit of $6,182.41 for 1947. In 1947, $4,800 was deducted on the partnership return as a manager's bonus paid to Cefalu. Cefalu included this amount as income on his individual return for 1947.

In 1946 Cefalu employed Paul A. Bartmess as a bookkeeper. Bartmess prepared and signed Cefalu's income tax return for 1945 from books and records prepared and kept by someone else. Bartmess kept records for 1946 and part of 1947. Receipts from the coin machines operated by Cefalu were not reported on the ledger kept by Bartmess. Bartmess prepared Cefalu's tax return for 1946 from the books he kept. Bartmess did not sign the jurat on the 1946 return.

Milton Plitt prepared the 1947 returns for Cefalu, his wife, and Cefalu Distributing Company. Plitt did not audit the books and records of Cefalu's operations or of Cefalu Distributing Company. The books of Cefalu Distributing Company were incomplete, and Plitt resorted to other evidence in preparing the 1947 return.

In 1950 the Internal Revenue Service began investigating the individual income tax returns of Cefalu and his wife. The Commissioner concedes that the taxpayer was cooperative with the agents and made no objection to their examination of his books and records. The books were incomplete. The cash receipts and disbursements journal of Universal Distributing Company for 1943–1945 disclosed many erasures and overwrites. In many instances when the alteration was decipherable, the original cash sales entry was for a larger amount than that of the subsequent overwrite.

The increase in net worth,[2] personal expenses, and taxable income of Cefalu and his wife were as follows:

|  | Increase in Net Worth | Personal Expenses | Taxable Income |
|---|---|---|---|
| 12/31/43 | $22,506.35 | $3,874.59 | $26,380.94 |
| 12/31/44 | 38,609.66 | 4,326.85 | 42,936.51 |
| 12/31/45 | 81,844.22 | 4,035.79 | 85,880.01 |
| 12/31/46 | 22,748.67 | 6,227.56 | 28,976.23 |
| 12/31/47 | 28,312.99 | 4,260.00 | 32,572.99 |

December 26, 1951, the Commissioner levied deficiencies and fraud penalties against the taxpayers for the years 1943–1947. The Tax Court sustained the Commissioner's determinations both as to the deficiencies and the fraud penalties.

A determination of tax liability made by the Commissioner is pre-

2. The statutory basis for the net worth method is Section 41 of Internal Revenue Code of 1939, 26 U.S.C.A. § 41. It provides that if the method of accounting employed by the taxpayer does not clearly reflect income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income.

sumptively correct; the burden is on the taxpayer to prove it erroneous. Richardson v. Commissioner, 4 Cir., 1959, 264 F.2d 400; Kite v. Commissioner, 5 Cir., 1955, 217 F.2d 585; Bryan v. Commissioner, 5 Cir., 1954, 209 F.2d 822, certiorari denied 348 U.S. 912, 75 S.Ct. 289, 99 L.Ed. 715. If the taxpayer shows that part of the Commissioner's determination was wrong, it does not destroy the presumption of correctness that attaches to his findings. Anderson v. Commissioner, 5 Cir., 1957, 250 F.2d 242, certiorari denied 356 U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 844.

## I.

### Deficiency Determination by the Net Worth Method.

In 1954 the Supreme Court considered fully the net worth method in four companion cases involving criminal evasion Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150; Friedberg v. United States, 1954, 348 U.S. 142, 75 S.Ct. 138, 99 L.Ed. 188; Smith v. United States, 1954, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192; United States v. Calderon, 1954, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202. This method of computing income taxes has been sustained by this Court in a number of cases, both criminal and civil.[3]

■ The net worth method may be stated as a mathematical formula: increase in net worth, plus non-deductible disbursements, minus nontaxable receipts, equals taxable net income.[4] The net worth of the taxpayer must be arrived at carefully but not necessarily with mathematical certainty. Clark v. Commissioner, 3 Cir., 1958, 253 F.2d 745. The primary essential is the establishment of an opening net worth.

Cefalu does not question the propriety of the use of the net worth method. He challenges the method of computation and the correctness of certain specific items.

■ First, the taxpayer contends that when the Commission reduced the bank balance at the close of each year by deducting the amount of checks issued to accounts payable that had not cleared the bank at the end of the year, the Commissioner should not have also reduced the respective accounts payable to reflect the payment. There is no merit to this contention. When the Commissioner credited the bank payments, it was proper to make an adjustment reducing the accounts payable; otherwise, the amount in question would be deducted twice from Cefalu's net worth. The taxpayer's objection that this treatment mixes the cash and accrual method is wholly without foundation; a cash basis taxpayer, for example, is entitled to deduct the amount of outstanding checks representing payments of business expenses. Clark v. Commissioner, 3 Cir., 1958, 253 F.2d 745.

■■ Cefalu's second attack is levelled at the Commissioner's including in liabilities a reserve for depreciation as an offset against assets. Cefalu contends that there should be no depreciation reserve for assets acquired during the taxable year and that depreciable assets, acquired in a prior year, should be valued at the original cost without depreciation. In using the net worth method, the value of opening assets is their current value, not their original cost. See Clark v. Commissioner, 3 Cir., 1958, 253 F.2d 745, 749; cf. Davena v. United States, 9 Cir., 1952, 198 F.2d 230, certiorari denied 344 U.S. 878, 73 S.Ct. 168, 97 L.Ed. 680. Including a depreciation reserve for assets acquired during the tax year is to the advantage of the taxpayer. It is carried as a liability and thus decreases the total net worth of the taxpayer for that particular year.

3. Anderson v. Commissioner, 5 Cir., 1957, 250 F.2d 242; Fairchild v. United States, 5 Cir., 1956, 240 F.2d 944; Bryan v. Commissioner, 5 Cir., 1954, 209 F.2d 822, certiorari denied 348 U.S. 912, 75 S.Ct. 289, 99 L.Ed. 715; Kenney v. Commissioner, 5 Cir., 1940, 111 F.2d 374; O'Dwyer v. Commissioner, 5 Cir., 1940, 110 F.2d 925.

4. Avakian, Net Worth Computation as Proof of Tax Evasion, 10 Tax L.Rev. 431 (1955).

Cefalu contends that there are specific errors in the computation for each year.

## A.—1943

Cefalu reported $4,004.20 as taxable income for 1943. The Commissioner determined his taxable income to be $26,380.94. Cefalu challenges two items in the computation.

1. *Music boxes or coin machines.* The Tax Court found that the machines Cefalu had acquired from the Universal Distributing Company when it liquidated in 1941 were worth $5,500. Cefalu contends that $10,737.50 should have been allowed, for this was the cost price of the machines. He contends also that he had machines in 1943 other than those acquired from Universal; that he had not less than two hundred machines instead of only twenty which the Tax Court allowed in the opening net worth. Cefalu asserts that $23,000 is the proper opening net worth of the machines. The Tax Court determination of the opening net worth of the coin machines acquired from Universal was based on Cefalu's own valuation of the machines in his 1943 tax return, Cefalu's record of the value of the machines which he received in 1941 upon the dissolution of Universal, and the value of the machines as shown by a chattel mortgage in 1941. This is ample proof to show the actual value of the machines in 1943. cf. Davena v. United States, 9 Cir., 1952, 198 F.2d 230. The taxpayer has not overcome the presumption of correctness that attaches to this finding of the Tax Court.

2. *Opening Cash.* The Tax Court found that Cefalu did not have any substantial amount of cash on hand at the beginning of the years in question. Cefalu, however, states that he had a cash hoard of $40,000 in a jar buried in his basement. Of course, some people still keep cash hoards—or so they say in tax cases when it is to their benefit to have a large opening net worth. "This favorite defense asserts that the cache is made up of many years' savings which for various reasons were hidden and not expended. * * *" Holland v. United States, supra. The Supreme Court[5] and this Court[6] have often affirmed a rejection by the Tax Court of a taxpayer's belated assertion of having owned a secret hoard of money. Cefalu's $40,000 cache is completely unsupported by any evidence except his own testimony. No plausible explanation is given for his keeping such a large sum of money hidden. His wife, who allegedly knew all about the hoard, did not testify in support of the claim. In the course of the tax investigation Cefalu told the agents that he had no cash other than that in bank accounts and daily operating cash. Cefalu filed no federal income tax returns for 1920–1923 or for 1936–1940. His returns for 1924–1935 reflected no taxes owed. His recurring need to borrow money is inconsistent with the claim to a secret hoard. Boyett v. Commissioner, 5 Cir., 1953, 204 F.2d 205. In the light of these circumstances we cannot say that the Tax Court's determination that Cefalu had no substantial cash on hand was clearly erroneous.

## B.—1944

Cefalu reported taxable income of $5,239.22 for 1944. The net worth determination for the year fixed his taxable income at $42,936.51. Cefalu challenges this determination on the ground that certain real estate bought by him was included at its purchase price of $25,000. The taxpayer contends that he paid $7,200, and assumed a mortgage of $18,300. He argues that the mortgage

5. Holland v. United States, 1954, 348 U.S. 121, 75 S.Ct. 127, 131, 99 L.Ed. 150; Friedberg v. United States, 1954, 348 U.S. 142, 75 S.Ct. 138, 99 L.Ed. 188; see cases annotated in 99 L.Ed. 174.

6. Anderson v. Commissioner, 5 Cir., 1957, 250 F.2d 242, 243; Goldberg v. Commissioner, 5 Cir., 1956, 239 F.2d 316; Bryan v. Commissioner, 5 Cir., 1954, 209 F.2d 822; Boyett v. Commissioner, 5 Cir., 1953, 204 F.2d 205; Carmack v. Commissioner, 5 Cir., 1950, 183 F.2d 1, certiorari denied 340 U.S. 875, 71 S.Ct. 121, 95 L.Ed. 636.

should have been added to his liabilities. The vendor of the property testified that the $25,000 was paid in full, and the deed stated it was a cash sale. Cefalu's proof falls far short of showing the existence of the alleged mortgage.

### C.—1945.

Cefalu reported taxable income of $10,-666.74 for 1945. The net worth determination fixed his taxable income at $85,-880.01. His challenge to this determination concerns stock he bought for $18,-633. He does not deny this purchase but contends it was paid for out of his cash hoard which by this time had been taken out of the ground and deposited in a safe deposit box. But this contention rests on the existence of the secret hoard.

### D.—1946

█ Cefalu reported $8,301.08 as taxable income for 1946. The Commissioner fixed his taxable income at $28,-976.23. Cefalu makes two objections to this computation. He claims that a check for $1400 payable to him from Cefalu Distributing Company should be deducted from personal expenses because the check was not deposited but cashed and presumably spent for personal expenses. There is no duplication here. Since the cashed check was never deposited, it was not included in the year end bank balance.

█ Cefalu concedes that $11,085.01 of income was omitted from his return for 1946. The omission is blamed on Bartmess the bookkeeper who prepared the return from books he maintained for Cefalu. Cefalu's contention that he had no knowledge of the omission has no effect on the deficiency determination. It bears solely on the question of fraudulent intent.

### E.—1947

█ Cefalu reported taxable income of $7,242.42 for 1947. The net worth determination fixed his taxable income at $32,572.99. He objects to two items. A prospective purchaser of his tobacco business paid Cefalu $5,000. Cefalu contends that it was error to include this as an asset, because it was a returnable advance and deductible from income. See Whitaker's Estate v. Commissioner, 5 Cir., 1958, 259 F.2d 379. There is no evidence that Cefalu ever returned this $5,000; at any rate, no evidence that it was returned in 1947, the last year here involved.

█ The final item that Cefalu attacks is the inclusion of kitchen units at $13,335 in the net worth determination. He contends that they were unsaleable, their market value was lower than their cost, and their net worth should have been stated at zero. There is no evidence to substantiate the taxpayer. Correspondence in 1947 concerning the units reflected an active demand for them. Cefalu contends that he sold them in 1955 for half their cost. It is obvious that the units were worth something in 1947, and the Tax Court properly rejected Cefalu's opinion that the units were worthless.

In short, Cefalu's net worth may not have been fixed with complete mathematical certainty but it was reasonably correct. Cefalu's objections to specific items have failed to overcome the presumption of correction attached to the Commissioner's deficiency determination.

### II.

#### Fraud Penalties.

█ Where any part of a tax deficiency is attributable to fraud with intent to evade tax, the Commissioner has the authority and the duty to collect a civil fraud penalty equal to fifty percent of the total deficiency. Int.Rev.Code of 1939, § 293(b), 26 U.S.C.A. § 293(b). In determining the correctness of fraud penalties, there is no presumption of correctness attached to the Commissioner's findings. The Commissioner has the burden of proving fraud by clear and convincing evidence. Carter v. Campbell, 5 Cir., 1959, 264 F.2d 930; Goldberg v. Commissioner, 5 Cir., 1956, 239 F.2d 316; see also Richardson v. Commissioner, 4 Cir., 1959, 264 F.2d 400. "The fraud meant is actual, inten-

tional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner, 5 Cir., 1941, 118 F.2d 308, 310.

■ Failure to report or mere understatement of income is not, standing alone, sufficient to prove fraud. Carter v. Campbell, supra; Anderson v. Commissioner, 5 Cir., 1957, 250 F.2d 242, 243. However, consistent and substantial understatement of taxable income is by itself strong evidence of fraud. Shahadi v. Commissioner, 3 Cir., 1959, 266 F.2d 495, appeal pending; Anderson v. Commissioner, supra; Drieborg v. Commissioner, 6 Cir., 1955, 225 F.2d 216.

Here, the taxpayer consistently understated his income by a substantial amount for a period of five years.[7] There is other evidence of fraud. He failed to maintain adequate and correct records. The inadequate records that were kept were altered to understate his income. He returned income in the name of his brother-in-law, Maggio. During the years he operated the Universal Distributing Company as a sole partnership he failed to report any of the income from the company in his individual returns. In 1946 and in 1947 Cefalu did not include in his returns any of the income from the Cefalu Distributing Company, except a manager's bonus of $4,800 in 1947. The Tax Court found as a fact that, contrary to the taxpayer's contention that this company was a partnership owned entirely by his children, the Cefalu Distributing Company was wholly owned by the taxpayer. In 1946 and 1947 the taxpayer failed to report all of the income he received from rentals and coin-operated machines.

■ In view of these and other facts, the evidence in the record clearly sup-

ports the holding of the Tax Court that at least part of the deficiencies for each of the years 1945, 1946, and 1947 was attributable to the taxpayer's fraudulent intent to evade the tax.

Judgment is

Affirmed.

| 7. | Year | Reported | Net Worth Determination of Income |
|---|---|---|---|
| | 1943 | $4,004.20 | $26,380.94 |
| | 1944 | 5,239.22 | 42,936.51 |
| | 1945 | 10,666.74 | 85,880.01 |
| | 1946 | 8,301.08 | 28,976.23 |
| | 1947 | 7,242.12 | 32,572.99 |