Anton F. Journey v. Commissioner.
Journey v. Commissioner
Docket No. 2531-64.
United States Tax Court
T.C. Memo 1966-222; 1966 Tax Ct. Memo LEXIS 62; 25 T.C.M. (CCH) 1138; T.C.M. (RIA) 66222; October 10, 1966
*62 Gregory M. Pillon, 821 Bates Ave., Detroit, Mich., for the petitioner. Joseph F. Dillon, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined the following deficiencies in income tax and additions to tax: Additions to tax
Income Tax
under § 6653(b),
Year
Deficiency
I.R.C. 1954
1955
$ 463.23
$ 231.62
1956
2,637.23
1,318.62
1957
997.95
498.98
1959
572.44
286.22
1960
595.80
297.90
1961
650.81
325.41 Petitioner has conceded that he is liable for the deficiencies in income tax as determined by the respondent for the years 1957, 1959, 1960 and 1961. Petitioner has also conceded that the deficiencies in income tax as determined by the respondent for the years 1955 and 1956 are correct in amount. The only remaining issues are (1) whether any part of the underpayment of tax for the years 1955, 1956, 1957, 1959, 1960 and 1961 was due to fraud with intent to evade tax within the meaning of section 6653(b) of the 1954 I.R.C. and (2) whether the years 1955 and 1956 are barred by the statute of limitations. Findings of Fact Some of the facts were stipulated *63 and they are so found. Petitioner Anton F. Journey is a resident of Detroit, Michigan. He filed his individual Federal income tax returns for the years before us with the district director of internal revenue, district of Michigan, at Detroit, Michigan. Petitioner was born in Austria in December 1889 and went to school in that country as far as the fourth grade. He came to the United States in April 1907. Petitioner's wife, with whom he had three children, died in 1952. Petitioner was employed as a tool and die maker during the years here involved. Petitioner had an account with the brokerage firm of Paine, Webber, Jackson and Curtis since 1936. During the years 1955 through 1957 and 1959 through 1961 petitioner purchased $129,274.72 in stocksk through this brokerage firm, sold $71,617.52 in securities through the firm, made cash deposits of $91,974.49 with the firm, and withdrew $36,369.79 in cash from his account with the firm. On October 29, 1952 petitioner and Matthew J. and Agnes M. Zak executed a land contract for the sale by petitioner of a residence in Detroit, Michigan, and in June 1956 James M. Graham assumed the obligations of the Zaks to petitioner under the land *64 contract. The monthly payments of $100 to petitioner under the contract covered both principal and interest. During the years before us petitioner received (1) interest income from bank accounts, a certificate of deposit, savings and loan accounts and from payments under the land contract, (2) dividend income, and (3) long-term capital gains from the sale of stocks as follows: Long-term
Year
Interest
Dividends
capital gains
1955
$ 564.81
$1,600.00
1956
555.90
1,045.00
$11,971.26
1957
628.38
1,945.20
1,989.48
1959
1,530.40
994.00
1960
956.98
2,248.00
1961
972.30
2,241.00
2,849.98
Petitioner filed a Michigan Intangibles Tax Return for the years 1955, 1956, 1957, 1959, 1960 and 1961 with the State Treasurer, Michigan Department of Revenue, at Lansing, Michigan. Petitioner showed on these returns that he owned stock in various corporations, indicating the value of such stock and the dividends received by him on such stock during the year covered by a particular return. Petitioner did not report the stock held by him in some corporations on the Michigan Intangibles Tax Returns filed by him during the years in question. Petitioner *65 did not report on his Federal income tax returns for the years before us the interest, dividends and long-term capital gains from stocks received by him during this period. Petitioner understated his adjusted gross income on his Federal income tax returns in the following amounts: Understatement
Reported Adjusted
Correct Adjusted
of Adjusted
Year
Gross Income
Gross Income
Gross Income
1955
$ 8,466.44
$10,581.25
$2,114.81
1956
11,297.39
18,833.92
7,536.53
1957
9,998.80
13,517.12
3,518.32
1959
8,119.48
10,593.88
2,474.40
1960
3,751.56
6,906.54
3,154.98
1961
2,327.36
6,915.65
4,588.29
No part of the underpayment of tax for the years 1955, 1956, 1957, 1959, 1960 and 1961 was due to fraud with intent to evade tax. Petitioner's returns for the years 1955, 1956, 1957, 1959, 1960 and 1961 were not false or fraudulent with the intent to evade tax. Opinion The only issue is whether petitioner's conceded failure to report in his tax returns the interest, dividends and long-term capital gains from stock sales received by him during the years before us was due to fraud with intent to evade tax. Section 6653(b) of the 1954 I.R.C. *66 The burden rests upon respondent to prove fraud by clear and convincing evidence. Cefalu v. Commissioner, 276 F. 2d 122. We have held that a mere understatement of income is insufficient to establish fraud and this is true even though understatements occur over a period of years. L. Glenn Switzer, 20 T.C. 759; Drieborg v. Commissioner, 225 F. 2d 216. Respondent must affirmatively show that a part of the underpayment in each year was due to fraud. There must be independent evidence which shows a willful intent to evade tax in failing to report income received. Petitioner admits the receipt of the income but it is his position that he did not know it was taxable. What is the nature of the independent evidence, apart from the understatements, [1] relied upon by respondent to show petitioner's willful intent to evade tax? The other evidence which respondent relies upon to show fraud is the testimony of the revenue agent as to what petitioner said at his various interviews with petitioner. The agent testified he had been auditing returns for about 11 years and that he commenced the audit of the returns here in question and his interviews with petitioner *67 in 1962, about 4 years before the trial. He said he had made notes of what transpired at these interviews. He did not say exactly when he made the notes but it fairly appears they were made either shortly after the interviews or at least before he completed his investigation in early 1963. He said he had used these notes to refresh his recollection by reading them a few days before the trial. The agent used no notes on the witness stand but much of his testimony was in answer to leading questions by respondent's attorney. On cross-examination he said he was not sure he would have been able to testify as he did without looking at those notes he had made. He said the notes were in the possession of respondent's attorney who was trying the case. This attorney in effect admitted he had the notes but he refused the demand of petitioner's attorney that they be turned over to him for his use in cross-examining the agent. *68 Respondent argues the petitioner made false answers to the revenue agent and this evidences a deliberate plan of concealment. The agent's first interview was his telephone call to petitioner on April 17, 1962. He stated he asked petitioner if he had any other income from sources other than those listed on his Federal income tax return and petitioner stated he had no other income. Respondent makes much of this misstatement on brief for it was not denied by petitioner and it is stipulated he had dividend and interest income during all of the years in question and capital gains income in three of the years. Petitioner probably construed the inquiry as referring to taxable income and if so, his answer to such a general inquiry made over the telephone is not inconsistent with his later testimony that he did not think dividend and interest income and gains from the sale of stock were taxable. The agent then testified to other misstatements of the petitioner during the initial personal interview on May 4, 1962. Petitioner and his daughter, who was a school teacher, and the revenue agent were present at this interview. The agent's testimony of what transpired at this conference and the *69 testimony of petitioner and his daughter are somewhat different. However, they all say that when the agent asked petitioner if he had a bank account he said he did not. It appeared that petitioner was of a somewhat suspicious and distrustful nature. He had not told any of his three daughters about his money in the bank. He explained his denial of the bank accounts to the agent by saying: "I am a pretty old man already and I had a daughter sitting right alongside of me, and I feel on there if I tell him [agent] anything on there they may work me too hard and I won't be able to hold any money. They might take it and I would have to be under their mercy." His daughter said she did not know he had any bank accounts. The agent testified he asked petitioner if he owned any stocks and the agent testified petitioner said he did not. Curiously enough, the agent, after he stated he received an answer from petitioner that he owned no stock, stated he then asked him why he had not reported dividend income and if he could see his stock and bond certificates. Both petitioner and his daughter stated petitioner answered the agent's first question with respect to the stock by saying he had a little *70 stock, not very much, and that the agent then asked for the stock certificates saying he wanted to take them to the broker's office to verify the account in his name. Petitioner said that the agent offered to give a receipt for the certificates but petitioner said he wouldn't give him any certificates. The daughter, who was a particularly forthright witness, could not remember whether the agent offered a receipt but she remembered the agent asked for the stock certificates to take with him and that he said he was honest and worked for the Government. The later questions of the agent concerning stock dividend income and stock certificates seem to corroborate the testimony of petitioner and his daughter that he did not deny ownership of stock in answer to the agent's first question about stock. The agent also testified petitioner told him he did not think dividends were taxable as he thought such dividends only had to be reported in the Michigan Intangibles Tax Return. These returns, which are in evidence, show that petitioner was reporting dividend income in the space provided on the State form. The agent said petitioner denied having a brokerage account at Paine, Webber, Jackson and *71 Curtis. Petitioner's remembrance of this was that he was asked if he knew anyone at Paine, Webber, Jackson and Curtis and his reply was: "Well, I said I don't know anybody on Paine and Webber. The only thing I know whenever I buy any stock on there I go to Paine and Webber to buy it." Petitioner was asked if he had any other income other than dividend and capital gains during the years here. He replied that he had sold the house but had suffered a loss on the transaction which seems to be his explanation of why he did not report any income received from the land contract. As to capital gains realized from the sale of stock in some of the years, petitioner testified that he "didn't spend it or take it any place" but that he just bought more stock with the proceeds and that he didn't know that profits from stock sales were taxable. Petitioner also testified that he prepared his Federal income tax returns during the years before us with the help of employees of the Internal Revenue Service. We must view all of the evidence, including the incoherent and irrational stories he told the agent and on the witness stand [2] and other explanations put forth by petitioner to explain his understatements *72 of income, against the whole background of this particular case. Petitioner was born in Austria in 1889 and obtained a meager education (through the fourth grade) prior to his arrival in the United States in 1907. It appears that he was employed in various capacities as a factory worker over the years, and on his Federal income tax returns for the years before us he listed his occupation as a tool and die maker. He seems to have been reticent about discussing his investments even with members of his own family. It is quite conceivable that petitioner, with his background, could harbor confused ideas as to the proper tax treatment of interest, dividends and gains from sales of stock. *73 At any rate, we do not believe that respondent has met his burden of showing fraud by clear and convincing evidence. It might well be that the record does engender some suspicion, but we have held that suspicion alone is not enough to sustain respondent's burden of proof. W. A. Shaw, 27 T.C. 561, affd. 252 F. 2d 681. We find, and so hold, that no part of the underpayment of tax for the years 1955, 1956, 1957, 1959, 1960 and 1961 was due to fraud with intent to evade tax within the meaning of section 6653(b) of the 1954 I.R.C.
We also find, on the basis of the entire record, that petitioner did not file false or fraudulent returns with intent to evade tax in any of the years before us within the meaning of section 6501(c)(1) of the 1954 I.R.C. Consequently, the years 1955 and 1956 are barred by the statute of limitations. Section 6501(a) of the 1954 I.R.C.
Decision will be entered under Rule 50. Footnotes
1. We might point out that the total interest income omitted by petitioner from his Federal income tax returns during this period included interest from Detroit Bank & Trust (#80953) ranging from $2.04 to $19.37, and interest from the National Bank of Detroit (#15909) ranging from $4.32 to $26.84. In the years 1955, 1956 and 1957 (when the total interest income was $564.81, $555.90 and $628.38, respectively), the interest received by petitioner on the land contract was $518.79, $519 and $242.71, respectively.↩
2. After telling the agent why he did not report dividend income (because he did not believe it taxable except by the State of Michigan) he told an absurd, fantastic story to the agent about a childhood friend with his same name buying stock. The agent said he did not believe the story and even his daughter said: "Let's stop acting like kids * * * tell us what he owes and we will pay it." He told an equally absurd but slightly different story on the witness stand of buying stock in his name with a man named "Joe" whose last name he did not know. He was noticeably emotionally disturbed on the witness stand when he told this fantastic story. At other times he seemed rational but he was a little prone to wander from the subject. Such wildly fantastic stories and his demeanor could be said to be the protective reaction of an elderly man to fear that the Government was after his lifetime savings but it is not clear that such behavior evidences fraud in reporting his income. He might well have reacted similarly if the Government's claim was based on mistake.↩