JACKIE R. WILLIAMS and ROSELLA M. WILLIAMS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Williams v. Commissioner
Docket No. 4759-74.
United States Tax Court
T.C. Memo 1976-212; 1976 Tax Ct. Memo LEXIS 191; 35 T.C.M. (CCH) 919; T.C.M. (RIA) 760212; June 30, 1976, Filed *191 Walter L. Mims and James E. Roberts, for the petitioners. Roy S. Fischbeck, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax for the years and in the amounts as follows: Tax Year Ended
Additions to Tax December 31
Deficiency
Sec. 6653(b), I.R.C. 1954 [1]
1969
$ 29,954.98
$17,781.49
1970
145,729.84
75,900.27
1971
22,042.85
11,021.43
The parties have agreed to the income tax deficiencies of petitioners for all of the years in issue leaving for our decision only whether petitioners are liable for the addition to tax for fraud for any or all of these years. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Siluria, Alabama at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1969, 1970 and 1971 with the Internal Revenue Southeast Service Center, Chamblee, Georgia. *192 During the years 1969 through the early part of 1971, petitioners owned and operate da sole proprietorship under the name of Interstate X-Ray Company. The business operations of the proprietorship consisted of purchasing and selling new, outdated and scrap x-ray film, used x-ray equipment and machinery, x-ray supplies and selling silver extracted and reclaimed from scrap x-ray film. Interstate X-Ray Corporation was organized and incorporated under the laws of the State of Florida on June 28, 1967 and was in business during the years here in issue. Its business was similar to that of the proprietorship and its place of business was Alabaster, Alabama. Prior to May 1, 1969, Interstate X-Ray Corporation Operated under the names of Alabama Solutions, Inc. and Alabama Solutions Service, Inc. Effective with the taxable year beginning May 1, 1969, the name of the corporation was changed to Interstate X-Ray Corporation. During the years here involved, Jackie R. Williams was president of the corporation and Rosella M. Williams was vice president and treasurer.Until May 1, 1970, they owned 50 percent of the corporation's issued and outstanding stock. On May 1, 1970, they acquired *193 an additional 40 percent of that stock. During the years 1969 through 1971, petitioners both actively participated in the business operations of the corporation and the proprietorship. Mr. Williams devoted his efforts primarily to purchases and sales and Mrs. Williams devoted her efforts primarily to office operations and management. From 1969 through September of 1972, a bookkeeper, Nellie Vance, was employed by Mr. Williams to keep records for both the proprietorship and the corporation. Miss Vance had previously been employed as an Accounts Receivable Clerk by one large corporation and in the Billing and Audit Department of another large corporation. During her employment by the proprietorship and corporation, she did general office work and was primarily responsible for posting sales to the sales journal of both the corporation and the proprietorship. In addition to Mr. Williams, there were five other salesmen working for the proprietorship and the corporation. Mr. Williams and the other salesmen all brought Miss Vance their sales tickets. She would price out the article sold and send out invoices and post the sales to either the sales journal of the proprietorship or *194 the corporation. The proprietorship made certain sales which were subject to state sales tax and other sales to organizations such as hospitals that were not subject to sales tax. To make it more convenient to keep the sales tax record, separate journal sheets were kept for sales subject to state sales tax and for those not subject to state sales tax. The proprietorship maintained a regular bank account at Exchange Security Bank, Birmingham, Alabama. Sales subject to state sales tax were generally deposited in this account. During the period March 1969 to September 1970, the proprietorship maintained a bank account at the Birmingham Trust National Bank, Birmingham, Alabama in the name of Interstate X-Ray Company, by Jackie R. Williams and R. M. Williams. Sales not subject to state sales tax were deposited into this account. During the taxable years here involved, the corporation maintained a bank account at First Bank of Alabaster, Alabaster, Alabama, and petitioners maintained a special bank account at Exchange Security Bank, Birmingham, Alabama, and during a portion of the period here involved maintained a special bank account at First Bank of Alabaster, Alabaster, Alabama. *195 Mr. Williams purchased, on behalf of the proprietorship, new x-ray film from Jack B. Davis, an employee of Low X-Ray Corporation, Atlanta, Georgia in the months and amounts as follows: February 1969
$67,731.21
February 1970
36,420.00
August 1970
80,001.11
These x-ray film purchases were not evidenced by regular invoices but by a statement of account written and signed by Mr. Davis and by 13 tickets signed by him ranging in amounts from $10,000 to $20,352.32. These tickets reflect the following dates, purchase amounts, payments and balances for the x-ray film purchases: Date
Purchases
Payments
Balance
February 1969
$67,731.21 $
$ 67,731.21
December 20, 1969
20,200.00
47,531.21
February 1970
36,420.00
83,951.21
March 1970
15,000.00
68,951.21
June 1970
15,000.00
53,951.21
August 1970
80,001.11
133,952.32
September 5, 1970
15,000.00
118,952.32
December 20, 1970
15,300.00
103,652.32
March 15, 1971
12,000.00
91,652.32
June 1971
12,000.00
79,652.32
September 26, 1971
12,000.00
67,652.32
December 14, 1971
11,900.00
55,752.32
May 6, 1972
10,500.00
45,252.32
December 12, 1972
14,900.00
30,352.32
April 2, 1973
10,000.00
20,352.32
July 30, 1973
20,352.32
*196 Jack B. Davis, from March 1967 to September 1970, was employed by Low X-Ray Corporation as operations manager of its warehouse in Atlanta, Georgia. His duties as operations manager included being responsible for security and maintenance of the inventories of Low X-Ray Corporation located in the Atlanta, Georgiia warehouse. Mr. Davis and Mr. Williams had become acquainted with each other during the time that both of them were employed by Low X-Ray Corporation prior to the years here involved. In June and September 1970, officials of Low X-Ray Corporation discovered losses of inventory, some of which were determined to be from the warehouse in Atlanta, Georgia. When Mr. Davis was unable to account for the inventory losses from the Atlanta, Georgia warehouse, Low X-Ray Corporation terminated his services and employment as operations manager of its warehouse in Atlanta, Georgia. It was not uncommon for Mr. Williams to pay for used x-ray film in cash. This film was bought by Mr. Williams from a number of sources. The film which Mr. Williams bought from Mr. Davis was paid for mostly in cash, but some of it was paid for by certified checks. In 1968, Mr. William Lampert, who at *197 the time was approximately 70 years old, was employed by petitioners to set up an accounting system for the corporation and to prepare income tax returns for petitioners and the corporation. Although he visited the offices of the proprietorship and the corporation on a number of occasions during the years here involved, he did not audit the business books and records of either the proprietorship or the corporation. Mr. Lampert did install an accounting system for the corporation consisting of a sales journal on a so-called peg-board system, a purchase journal, a cash receipts record, a cash disbursements record and an individual receivable record. He advised petitioners to set up for the proprietorship a purchase journal, a sales journal, a cash receipts record, a cash disbursements record, an accounts receivable record, and an accounts payable record. He also advised Mr. Williams to keep the books and records of the corporation and proprietorship separate. Mr. Lampert in 1968 had been practicing accounting for approximately 40 years. He had a 4-year accounting course at New York University and a business administration course at Columbia University. From 1960 to 1966, when *198 he retired, Mr. Lampert had managed the business and financial affairs of a physician which included the management of two offices, a trucking business, a restaurant and the installation of accounting systems for each of these business operations. When Mr. Lampert visited the offices of the proprietorship and corporation to prepare the income tax returns, he would ask for summaries of proprietorship sales, purchases and operating expenses. Petitioners would ask Miss Vance to furnish Mr. Lampert with the information he requested, which she attempted to do, and Mr. Lampert, in preparing the tax returns, relied on these summaries. Petitioners made no thorough review of the returns as prepared by Mr. Lampert before signing them. Mr. Lampert, in preparing the corporate tax return, relied on the records furnished him by petitioners, usually through Miss Vance. He did not use the bank accounts of the proprietorship in preparing the tax returns. In July 1972, Mr. Williams was advised by an Internal Revenue Agent that the 1971 income tax return of the corporation had been assigned for audit. On September 11, 1972, this audit began and shortly thereafter the audit was expanded to include *199 the joint Federal income tax returns of petitioners for 1970 and 1971. On September 19, 1972, the revenue agent sent petitioners a letter pertaining to the examination of their 1970 and 1971 Federal income tax returns and requesting certain specific records of the proprietorship, including sales invoices and cash receipts records, purchase invoices and canceled checks. Mr. Williams instructed Miss Vance to furnish these records to the revenue agent. Sometime in September 1972, Miss Vance had left her work for the proprietorship and corporation but had begun working for an automobile tire business owned by Mr. Williams that had offices in the same building as the proprietorship and corporation. Miss Vance placed in boxes all of the records that she considered to have been requested and furnished them to the revenue agent. Specifically included in the boxes were canceled checks and other bank records of both of the bank accounts of the proprietorship. Mr. Lampert furnished to the revenue agents certain summary sheets of proprietorship sales, purchases and expenses, which he stated had been furnished him by petitioners. In January 1973, the revenue agent referred the examination of *200 the income tax returns of the corporation to the Intelligence Division of the Internal Revenue Service. Shortly thereafter, Mr. Williams, as president of the corporation, was visited by the special agent and subsequently he was served with a summons to produce certain books and records of the corporation. This summons resulted in a proceeding for enforcement being brought in the United States District Court for the Northern District of Alabama in the case of United States v. Interstate X-Ray Corp., an unreported case ( N.D. Ala. 1973, 32 AFTR 2d 73-5742, 73-2 USTC par. 9667), which was decided on July 16, 1973. In this case the Court held that the corporation and Mr. Williams had submitted all of the available corporate books and records for the corporate fiscal years ended April 30, 1970 through April 30, 1972, to the agents of the Internal Revenue Service for examination and the petition was dismissed. About the time the special agent entered the investigation involving the corporation, Mr. Williams telephoned Mr. Lampert, who had represented him with respect to the audit of petitioners' personal tax returns which included on Schedule C the reported earnings *201 of the proprietorship, and told him that he had discovered that approximately $60,000 of proprietorship sales had been omitted from petitioners' joint Federal income tax returns. Mr. Lampert suggested that an amended return be filed to report the omitted sales. Mr. Williams and Mr. Lampert advised petitioners' attorney of the omitted sales and were advised not to file an amended return at that time because of the investigation by the special agents into the tax liability of the corporation. This attorney also suggested that a certified public accountant be retained by petitioners to make a thorough audit of their books. Beginning in the latter part of 1970, after petitioners owned 90 percent of the corporation, many of the proprietorship invoices were put on invoice forms of the corporation. Even though on corporate invoice forms, these sales were posted to the books of the proprietorship and not to the corporate books. Sometime in October 1973, the fraud investigation of the corporation was dropped by the Intelligence Division and another revenue agent was assigned to investigate the petitioners' tax returns for the years 1969 through 1971, the agent who originally began the *202 investigation having been assigned to another position. The second revenue agent resumed the examination in February 1974. When this revenue agent asked Mr. Williams and his attorney at the proprietorship's office in Alabaster, Alabama for the books and records of the proprietorship, they were told that they were just as the first revenue agent had left them. This revenue agent discovered that there were in November and December, 1970, certain sales to hospitals, the collection from which had been deposited in the proprietorship account at the Exchange Security Bank, which had not been recorded on the proprietorship books and records. The second revenue agent to his knowledge did not see the statement of account of the 13 tickets reflecting the purchases of x-ray film by Mr. Williams from Mr. Davis in 1969 and 1970 and did not see the records of the proprietorship account at the Birmingham Trust National Bank until these records were pulled out and furnished to him by Mrs. Williams. The certified public accountant employed by petitioners to audit the books and records and compute properly the proprietorship's income for the years 1969 through 1971 had been certified to practice *203 in Alabama since 1951. Since 1951 he had practiced as a certified public accountant, all but the first 3 years being with his own firm. He was a graduate of the University of Alabama with an accounting major and had served as president of the local chapter of the Alabama Society of CPAs. This accountant discovered that the proprietorship had two parts to its sales journal, one in which sales not subject to state sales tax were recorded and the other in which sales subject to state sales tax were recorded. The journal pages were loose with paper clips to divide the two sections. The accountant put the pages in a binder and placed tabs on the journal for convenience in its use. The accountant found a complete set of records except for a general ledger. He discovered that the income of the proprietorship as shown on Schedule C of the returns filed by petitioners had been computed on an accrual basis in 1968, a cash receipts and disbursement basis in 1969, and that the gross receipts shown on Schedule C of the 1969 return represented the total debit to cash on hand from the proceeds of sales subject to state sales tax but did not include the sales not subject to state sales tax *204 entered in another part of the journal. The 1969 return had marked on it that it was on the cash method. The 1970 return also indicated that it was on the cash method. The sales shown on that return represented total debits to accounts receivable as shown on the journal pages including sales tax and some other nonincome item. Therefore, even though the 1970 return indicated that it was prepared on the cash basis in fact the sales shown thereon were computed on an accrual basis. The certified public accountant completely recomputed the sales, cost of sales, other income and expenses of the proprietorship and the total income of petitioners for each of the years 1969 through 1971 and the parties now agree to the accuracy of the computations he made. The books and records used by the certified public accountant in computing the income of the proprietorship were the books and records he found in the Alabaster office of the proprietorship in which the revenue agent had been working and were the books and records which he was informed by petitioners were furnished to the revenue agent. The following schedule shows the corrected income of petitioners for the calendar year 1969 and *205 the income as reported by them on their return for that year: Corrected Income-1969
Reported Income-1969
Interstate X-Ray Company
Sales-Taxable
$ 98,989.92
Sales-Exempt-Regular Account
13,123.75
Sales-Exempt-Special Account
67,144.34
Total Sales
$179,258.01
Sales Returns & Allowances
599.07
$178,658.94
$104,815.00
Cost of Sales
Inventory - 1/1/69
$ 9,500.00
$ 9,500.00
Purchases
133,285.95
80,212.00
Total Cost
$142,785.95
$ 89,712.00
Inventory - 12/31/69
6,000.00
6,000.00
Cost of Sales
136,785.95
83,712.00
Gross Margin on Sales
$ 41,872.99
$ 21,103.00
Expense
Travel Expense
$ 1,728.89
$ 1,729.00
Depreciation
1,899.00
1,049.00
Telephone
1,018.58
1,018.00
License
110.00
110.00
Labor
90.00
In Cost
Freight
43.73
44.00
Bank Charges
30.03
17.00
Office Supplies
33.75
34.00
Accounting
25.00
25.00
Home Expense
109.00
Total Expense
4,978.98
4,135.00
Net Operating Income
$ 36,894.01
$ 16,968.00
Other Income
Interest Income
$ 1,115.02
$ 1,115.00
Salary-Low X-Ray Co.
7,133.58
7,134.00
Salary-Interstate X-Ray Corp.
1,200.00
1,200.00
(21.75)
(22.00)
Dividend
21.75
22.00
Glen Green-Jacksonville, Fla.
3,010.47
Net Income-Alabaster Tire Shop
414.34
(105.00)
Total
12,873.41
9,344.00
Adjusted Gross Income
$ 49,767.42
$ 26,312.00
Deduction
-2,216.77
-2,401.00
Exemption
-1,800.00
-1,800.00
Taxable Income
$ 45,750.65
$ 22,111.00
*206 The following schedule shows the corrected income of petitioners for the calendar year 1970 and the income as reported by them on their return for that year: Corrected Income-1970
Reported Income-1970
Interstate X-Ray Company
Sales - Regular
$291,145.03
$117,031.02
Sales - Silver
39,385.60
39,385.60
Total Sales
$330,530.63
$156,416.62
Less Returns & Allowances
594.44
$329,936.19
416.08
$156,000.54
Cost of Sales
Inventory - 1/1/70
$ 6,000.00
$ 6,000.00
Purchases
197,246.64
133,452.54
Labor
168.00
Total
$203,246.64
$139,620.54
Inventory - 12/1/70
0
$203,246.64
0
$139,620.54
Gross Profit on Sales
$126,689.55
$ 16,380.00
Expense
Labor
$ 2,905.17 $
Depreciation
2,191.74
1,049.00
Commission
1,548.62
4,285.79
Travel
587.4 0
587.40
Telephone
423.78
423.78
Interest
590.25
150.00
Repairs
213.00
213.00
Freight
676.08
676.08
Payroll Taxes
382.29
205.71
Gasoline
264.65
264.65
Taxes & Licenses
135.00
135.00
Bank Charges
25.04
27.31
Office Supplies
100.70
100.70
Miscellaneous
26.34
26.34
Accounting
200.00
200.00
Insurance
177.16
Total Expense
10,270.06
8,521.92
Net Income - Interstate X-Ray
$116,419.49
$ 7,858.08
Other Income
Curlee X-Ray Co. - Loss
$ (12,044.73)
Salary Income
21,322.88
21,322.88
Interest Income
1,198.09
1,192.50
Alabama Tire Center - Net
8,827.92
7,259.67
Self Insurance Plan Income
703.88
Sales Tax Discounts
715.29
(38.25)
Dividend Income
38.25
(77.50)
Gain on Sale of Hale Property
155.00
Informal Dividends
2,389.99
23,190.82
29,775.05
Rent and Farm Income
Rent Received
$ 4,340.75
$ 3,000.00
Rent Expense
Depreciation
$ 2,721.71
$ 2,850.00
Interest
2,614.62
2,967.00
Insurance
341.00
357.00
Utilities
9.37
9.37
Taxes
375.18
Total Expense
$ 5,686.70
$ 6,558.55
Net Loss
(1,345.95)
(3,558.55)
Adjusted Gross Income
$138,264.36
$ 34,074.58
Deductions
- 3,522.13
- 7,471.07
Exemptions
- 1,875.00
- 1,875.00
Taxable Income
$132,867.23
$ 24,728.51
*207 The following schedule shows the corrected income of petitioners for the calendar year 1971 and the income as reported by them on their return for that year: Corrected Income-1971
Reported Income-1971
Interstate X-Ray Company
Sales
$ 1,662.85
Less Sales Discounts
.06
Net Sales
$ 1,662.79
Cost of Sales
Inventory 1/1/71
0
Purchases
87.00
Total Cost
87.00
Inventory 12/31/71
0
87.00
Gross Profit
$ 1,575.79
Expense
Property Tax
$ 47.12
Accounting
100.00
Depreciation
53.70
Interest
758.26
Total Expense
959.08
Net Operating Income
$ 616.71
Rental Income & Farm
$ 2,238.00
Rent Received
$11,337.90
9,000.00
Expense
Depreciation
$ 8,547.06
$ 5,783.00
Insurance
378.00
548.00
Interest
6,037.73
4,360.00
Other Expense
16.45
2,005.00
Total Expense
$14,979.24
$12,696.00
Net Rental Income
(3,641.34)
(1,458.00)
Other Income
Salary Income
$18,000.00
$18,000.00
Gain on Sale of Hale Property
2,800.74
Less Capital Gain Deduction
(1,158.02)
Interest Income
2,676.16
1,545.00
Alabaster Tire Store
2,224.08
4,496.08
Self Insurance Income
1,086.02
Dividend Income
38.25
38.25
Dividend Exclusion
(38.25)
(38.25)
Other Income
3.19
Storm Damage - Tire Store
(64.93)
Informal Dividends
2,531.00
28,098.24
24,041.08
Adjusted Gross Income
$25,073.61
$22,583.08
Deduction
3,243.80
6,424.00
Exemption
2,025.00
2,025.00
Taxable Income
$19,804.81
$14,134.08
*208 The following schedule shows the income of the corporation, Interstate X-Ray, for its Fiscal Year Ended April 30, 1971, and the income of that corporation as reported on its tax return for that year: Adjusted Balance
Per Tax Return
Income
Sales
$701,824.20
$720,200.14
Sale of Inventory
Total
$701,824.20
$720,200.14
Less: Returns & Allowances
- 526.15
- 13,655.86
Net Sales
$701,298.05
$706,544.28
Less: Cost of Goods Sold
-424,340.25
$276,957.80
-402,820.59
$303,723.69
Other Income
Interest Income
$ 168.52
$ 79.00
Expense Reimbursement
Realized Profits
1,224.23
Rent Income
250.00
Other Income
88.80
+ 1,481.55
706.40
+ 1,035.40
Gross Profit on Sales
$278,439.35
$304,759.09
Expenses
Salaries: Officer
$ 23,750.00
$ 27,000.00
Other
59,852.82
57,623.27
Salesmen's Commissions
36,158.44
35,835.75
Professional Fees
900.00
3,065.48
Rent
5,650.00
5,650.00
Office Supplies
2,853.33
2,802.19
Telephone & Telegraph
6,211.99
6,211.99
Utilities
897.23
917.88
Taxes
5,220.34
460.85
Gas & Oil
10,444.54
12,625.36
Travel Expense
3,430.64
4,164.82
Auto Allowance
480.20
1,280.20
Entertainment
1,332.26
1,332.26
Sales Promotion
279.11
2,789.33
Advertising
913.38
Truck & Car Rental
1,655.90
1,655.90
Repairs & Maintenance
6,139.03
6,139.03
Postage
597.39
597.39
Freight & Expense
2,314.51
2,284.51
Dues & Subscriptions
163.15
163.15
Donations
10.00
225.76
Bad Debt Expense
6,076.15
5,476.15
Depreciation
18,858.84
15,261.93
Insurance
3,569.69
4,492.49
Miscellaneous Expense
1,242.89
1,374.31
Bad Debt Expense
645.32
Repair Parts
Interest
2,500.30
4,933.68
Service Department Supplies
3,140.99
Leased Equipment Expense
Airplane Expense
11,816.80
10,473.76
-213,964.25
-217,978.43
Net Operating Income
$ 64,475.10
$ 86,780.66
Other Income (Less)
Gain/Loss on Sale of Inventory
$ (304.53) $
Loss on Investments
(2,590.25)
Purchase Discounts
(304.53)
532.77
(2,057.48)
Net Income Before Taxes
$ 64,170.57
$ 84,723.18
*209 The following statement shows the corrected income of the corporation, Interstate X-Ray, for its Fiscal Year Ended April 30, 1972, and its income as reported on its tax return for that year: Adjusted Balance
Per Tax Return
Income
Sales
$703,275.97
$710,686.06
Sale of Inventory
Total
$703,275.97
$710,686.06
Less: Returns & Allowances
- 967.88
- 11,902.97
Net Sales
$702,308.09
$698,783.09
Less: Cost of Goods Sold
-433,543.22
$268,764.87
-462,695.35
$236,087.74
Other Income
Interest Income
$ 482.00 $
Expense Reimbursement
Realized Profits
1,855.66
Other Income
1,553.72
+ 3,891.38
1,760.99
+ 1,760.99
Gross Profit on Sales
$272,656.25
$237,848.73
Expenses
Salaries: Officer
$ 14,903.68
$ 28,000.00
Other
68,429.17
55,472.35
Salesmen's Commissions
21,165.09
21,265.09
Professional Fees
5,707.55
1,432.07
Rent
8,425.00
8,225.00
Office Supplies
2,063.45
2,073.04
Telephone & Telegraph
4,717.96
4,913.65
Utilities
1,301.13
1,370.09
Taxes
7,243.67
5,427.74
Gas & Oil
10,415.40
10,415.44
Travel Expense
3,753.81
5,493.42
Auto Allowance
1,302.85
1,302.85
Entertainment
547.51
547.51
Sales Promotion
130.83
Advertising
690.89
690.89
Truck & Car Rental
731.61
634.11
Repairs & Maintenance
7,497.51
6,656.02
Postage
657.96
657.78
Freight & Expense
2,344.90
2,350.26
Dues & Subscriptions
140.82
140.82
Donations
130.83
Bad Debt Expense
1,128.13
1,128.13
Depreciation
12,005.05
8,304.43
Insurance
4,071.16
4,248.32
Miscellaneous Expense
200.00
2,229.84
Repair Parts
2,915.24
1,643.68
Interest
2,566.30
3,431.78
Service Department Supplies
517.48
Leased Equipment Espense
658.58
Airplane Expense
59.24
Commission on Sale of Airplane
-186,291.97
(900.00)
-177,285.14
Net Operating Income
$ 86,364.28
$ 60,563.59
Other Income (Loss)
Gain/Loss on Sale of Equipment
$ (7,041.58)
$ 4,502.10
Purchase Discounts
5,451.25
- (1,590.33)
+ 4,502.10
Net Income Before Taxes
$ 84,773.95
$ 65,065.69
*210 Respondent in his notice of deficiency to petitioners increased their adjusted gross income from their business by the amounts of $88,270.89, $162,115.95 and $39,158 for the years 1969, 1970 and 1971, respectively. Respondent also determined that dividends of $104,147.33 and $11,627.65 in 1970 and 1971, respectively, had been received by petitioners from the corporation based on the proprietorship sales which had been billed on the invoice forms of the corporation. Respondent also determined that petitioners were liable for the addition to tax for fraud for each of the years here in issue. The explanation given by respondent for his determination with respect to increased business income was as follows: It is determined that your gross receipts from business and/or farming for the taxable year 1969 totaled $213,117.21 in lieu of $105,834.00 as reflected on your return, for the taxable year 1970 totaled $321,968.59 in lieu of $196,721.43 as reflected on your return, and for the taxable year 1971 totaled $128,156.00 in lieu of $88,998.00 as reflected on your return. It is determined that your cost of sales from business for the taxable year 1969 totaled $103,253.32 in lieu of *211 $84,241.00 as reflected on your return, and for the taxable year 1970 totaled $125,494.57 in lieu of $162,363.36 as reflected on your return. Consequently, your taxable income is increased in the amount of $88,270.89 for the taxable year 1969, $162,115.95 for the taxable year 1970, and $39,158.00 for the taxable year 1971. Respondent merely explained with respect to the increase in dividend income that it had been determined that petitioners received such dividends, no part of which had been reflected on their income tax returns. OPINION The only issue remaining in this case is whether any part of petitioners' underpayment of tax for any of the years here in issue was due to fraud with intent to evade payment of tax. As both parties recognize, the burden is on respondent to establish such fraud by clear and convincing evidence. Cefalu v. Commissioner,276 F. 2d 122 (5th Cir. 1960), affirming a Memorandum Opinion of this Court. As the Court stated in that case at 128-129, in a quote from Mitchell v. Commissioner: "* * * 'The fraud meant is actual, intentional *212 wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing.' Mitchell v. Commissioner, 5 Cir., 1941, 118 F.2d 308, 310." In our view, the evidence here falls far short of any showing of fraud. It may well be that petitioners were careless in leaving their bookkeeping to a young woman whose previous experience had been somewhat limited and the preparation of their tax returns to a retired accountant who prepared them in reliance on information which this bookkeeper furnished him. However, carelessness of this type is not fraud. Respondent relies primarily on his contention that petitioners did not disclose their records to the revenue agent. However, the evidence here does not support respondent's contention in this respect. The evidence shows that all of the proprietorship records were made available to the revenue agents even though apparently some items were not specifically pointed out to them as being in the boxes furnished to them. In fact, one of the revenue agents in testifying about certain items not furnished to him stated in response to a question by the Court that he never specifically asked for the particular item *213 and the testimony of other witnesses clearly indicates that this item along with other items requested were contained in the boxes of documents provided to this revenue agent for his examination. One of the major contentions is with respect to whether the records of the account at the Birmingham Trust National Bank were ever made available to the revenue agents. From the evidence, we conclude that the records of this account were contained in the boxes furnished to the agents and that the account was kept as a convenient means of segregating receipts from sales subject to state sales tax and those not subject to state sales tax. Clearly, all of the sales were not included on the tax returns, which petitioners filed, nor were all the purchases. Whether the failure to include all sales and purchases on the returns was because proper records were not furnished to Mr. Lampert or because he did not specify to petitioners' bookkeeper the records he needed is not clear from the record. The record, however, is clear that petitioners relied on the bookkeeper and Mr. Lampert to prepare the Schedule C of the tax returns showing the income from the proprietorship and that the proprietorship *214 records were adequate to reflect the proprietorship income and were later used by a certified public accountant in properly computing the proprietorship income. Even though petitioners may have been careless to rely on the bookkeeper and Mr. Lampert, there is no evidence that this reliance by petitioners was with any fraudulent intent to evade taxes. The evidence in the record indicates that there was no such intent. Mr. Williams only casually glanced at the returns before he signed them since he assumed Mr. Lampert had properly prepared them from the proprietorship records which were completely adequate to show the correct income of the proprietorship. In certain instances, merely an understatement of income to the extent that petitioners' income here was understated might be some indication of fraud, though generally it has never been considered sufficient to be clear and convincing evidence of fraud. However, since proprietorship monies were being used in the business, it is doubtful that petitioners would have been aware of the understatement of income had they reviewed the income tax returns more carefully unless they had compared the figures shown on the returns with those *215 shown in the business records. Respondent's other main reliance for his position that he has established fraud is the fact that Mr. Williams made cash purchases of film from Mr. Davis. Respondent even argues that this was film which Mr. Davis "had embezzled." The record totally fails to show where Mr. Davis acquired this film. Although Mr. Davis was discharged because of inventory shortages in the Atlanta warehouse of the Low X-Ray Corporation there is no indication in the record that Mr. Davis had misappropriated the film and certainly not the slightest indication that any action was commenced against him or that he was prosecuted criminally. Mr. Williams testified that it was not uncommon for him to buy film from employees of hospitals or other places where film was used and that he assumed the employee was able legally to acquire the film for resale to him. Even if Mr. Williams should have investigated how Mr. Davis acquired the film that the proprietorship purchased for him, which respondent has not shown to be a fact, the purchase of this film is not an indication of fraud in reporting petitioners' taxable income. Apparently some of the purchases of this film were part *216 of the purchases that were not deducted on the income tax returns. Respondent argues that part of the sales not reported on the returns were sales of the film that Mr. Williams purchased from Mr. Davis but there is no evidence whatsoever in the record to support this contention. Insofar as this record shows, there was nothing amiss with Mr. Williams' purchase of film from Mr. Davis. Unsupported suspicions cannot substitute for evidence to sustain respondent's burden of proof of fraud. After considering all the evidence in the record in this case, we conclude that respondent has failed to establish by clear and covincing evidence that any part of the understatement of tax by petitioners for any one of the years 1969, 1970 or 1971 was due to fraud. We, therefore, hold respondent is not entitled to any addition to tax for fraud under section 6653(b). Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩