LOUIS REVADER and LETTIE MAE REVADER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Revader v. Commissioner
Docket No. 7293-78.
United States Tax Court
T.C. Memo 1980-473; 1980 Tax Ct. Memo LEXIS 112; 41 T.C.M. (CCH) 240; T.C.M. (RIA) 80473; October 22, 1980, Filed *112 Held: 1. Respondent failed to prove by clear and convincing evidence that any part of the underpayment of tax by petitioners for 1971 and 1972 was due to fraud. Addition to tax under sec. 6653(b), I.R.C. 1954, not approved. 2. Petitioners are entitled to a deduction in 1972 for additional wages paid in cash in an amount determined by the Court. R. Travis Douglas, for the petitioners. William A. Neilson, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In the statutory notice of deficiency, respondent determined the following deficiencies in and additions to petitioners' income tax: Additions to tax
Year
Deficiency
sec. 6653(b), I.R.C. 1954
1971
$19,948.73
$ 9,974.37
1972
47,672.16
23,836.08
The parties have reached agreement as to *113 the adjustments which resulted in the determined deficiencies and we adopt their agreements with respect to such adjustments. The issues remaining for decision are: (1) Whether parts of the underpayments of tax required to be shown on petitioners' returns for 1971 and 1972 were due to fraud under section 6653(b), I.R.C. 1954, on the part of petitioner Louis Revader; and (2) whether petitioners are entitled to an additional business expense deduction for 1972 for wages paid in cash. Respondent has conceded that no part of any underpayment was due to fraud on the part of petitioner Lettie Mae Revader. FINDINGS OF FACT Some of the facts have been stipulated and they are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Louis and Lettie Mae Revader, husband and wife, resided in Boutte, La., during the years here involved and when they filed their petition in this case. They timely filed joint Federal income tax returns for the calendar years 1971 and 1972 with the Director, Internal Revenue Service Center, Austin, Tex.
Louis Revader was 50 years old at the time of the trial herein (1979), *114 was born and lived his entire life around Boutte, La., and had a limited education, having completed no more than the fifth or sixth grade in the local school. From 1954 through the taxable years in issue, petitioner Louis Revader owned and operated a sole proprietorship (hereinafter petitioner or Revader) in the business of hanging and finishing sheetrock. Revader used the cash basis method of accounting during the years in question. Revader generally worked as a subcontractor to larger contractors, principally working for a single painting contractor. Prior to 1970 the volume of business done by Revader was small and he had very little working capital. His crews consisted of four to five sheetrock hangers who worked as subcontractors to Revader and four or five sheetrock finishers who worked for Revader. Beginning in 1970, business increased rapidly because Revader obtained several contracts on a number of large, Government-financed, building projects. During 1971 and 1972 Revader worked for a total of 29 different contractors, although the largest single contractor continued to be the painting contractor. Revader worked for a total of 20 different contractors in 1971 and *115 19 in 1972. Revader's work crews increased to a total of 20 to 30 men. The sheetrock contracts obtained by Revader were divided by him into two components, "hanging" and "finishing." The "hanging" of sheetrock involved the nailing of sheetrock to a wallframe. "Finishing" involved taping and otherwise leveling the sheetrock surface. Revader generally "subcontracted" the hanging of the sheetrock to "subcontractors" and "pieceworkers," individuals whose recompense depended upon the amount of sheetrock hung. Subcontractors were individuals who, either working alone or with others also working for them, hung sheetrock for Revader on a regular basis. Pieceworkers hung sheetrock for Revader on an irregular basis, depending upon when the worker needed a job. Revader created this distinction between subcontractors and pieceworkers. Revader paid his subcontractors by check and he issued Form 1099 informational returns to them at the end of the year, although the payments reflected on the Forms 1099 did not always coincide with the total check amounts. Pieceworkers were generally also paid by check, but Forms 1099 were not issued to them at the end of the year. Included among the *116 pieceworkers who worked for Revader during 1971 and 1972 were several of Revader's sons, one of whom was paid $10,530 during 1971. The finishing of sheetrock was done by employees of Revader's who were paid an hourly wage. Revader issued Forms W-2 to these individuals during each of the taxable years, but the amounts reported on these forms did not always coincide with the amounts paid by check to these individuals. During 1972 Revader had a contract to install sheetrock in a large apartment complex under construction. When the work fell behind schedule, Revader was asked by his contractor to work on weekends to catch up. Revader was able to employ additional pieceworkers to work on weekends but only if they were paid in cash and no amounts were withheld for taxes. Revader agreed to these conditions; there being no other source of labor. He estimated that these pieceworkers worked between 50 and 60 weekend days in 1972 and he estimated he paid an average of $400 in cash for wages on each weekend day worked. [1]
*117 Each of the contractors for which Revader worked issued checks to Revader for work performed. Some of the contractors withheld a certain percentage until the contracts were completed. Revader disposed of the checks received in various ways: Some were cashed at the Pink Palace Bar; some were deposited to Revader's bank accounts; and some were used to purchase certificates of deposit. In addition, there were checks for which the parties could not account. A chart showing the amounts received by Revader and his disposition thereof is set forth below: Total Check Amounts
Cashed
Deposited
Used to
Taxable
at Pink
to bank
purchase
Disposition
year
Received
Palace Bar
accounts
Cds
unknown
1971
$251,294.96
$61,982.13
$165,546.03
$13,000
$10,766.80
1972
369,519.69
18,652.90
327,769.03
19,332
3,765.76
Respondent's agents determined from an analysis of checks received by Revader and not deposited in his bank account plus withdrawals from his checking account, and minus identified cash expenditures, that at the end of 1972 Revader should have had cash on hand in the amount of $25,442.27. Petitioner agrees with this analysis *118 but claims that the cash was used during 1972 to pay wages to the itinerant weekend employees who demanded their wages in cash. Revader's practice of cashing checks at the Pink Palace Bar began prior to 1971 as a consequence of the owner of the bar, Mr. Darensbourg (hereinafter Darensbourg), cashing payroll checks for Revader's employees and subcontractors. When Darensbourg negotiated these payroll checks, they were frequently returned for lack of sufficient funds in Revader's account because Revader often had to pay his employees before he collected from his contractor. Darensbourg then agreed, as a favor to Revader, to hold the payroll checks for a week or 10 days until Revader could redeem them with contractors' checks Revader received. The redeemed checks did not go through Revader's bank account. When this arrangement began, Revader was in a cash-poor financial position. In 1971 Revader cashed $61,982.13 in checks at the Pink Palace Bar and redeemed $45,491.93 worth of employees' or subcontractors' checks. In 1972, although Revader cashed $18,652.90 in checks at the Pink Palace Bar, no employees' or subcontractors' checks were redeemed. During the latter part of 1971 and *119 1972, it was no longer necessary for Darensbourg to hold checks since Revader was in a better financial position. Revader allowed the arrangement to continue, however, based on his belief that he was somehow returning a favor to Darensbourg. During 1971 Revader purchased $25,000 in certificates of deposit.A 90-day certificate (hereinafter certificate No. 1) was purchased in March 15, 1971, in the amount of $3,071.55. Certificate No. 1 was a renewal of a similar 90-day certificate which Revader had purchased on December 15, 1970, in the amount of $3,033.75. This principal amount plus interest of $37.80 were used to purchase certificate No. 1. On June 13, 1971, Revader purchased a 90-day certificate of deposit (hereinafter certificate No. 2) in the amount of $10,000. Funds available to purchase this certificate were: (a) $5,305 withdrawn from a savings account on June 11, 1971; (b) a $3,000 contractor's check received on June 1, 1971, and (c) $3,109.41 (principal of $3,071.55 and interest of $37.86) received when certificate No. 1 was paid on June 11, 1971. Certificate No. 2 was renewed by Revader on September 13, 1971, December 12, 1971, March 12, 1972 (for 6 months), and *120 September 12, 1972 (for 6 months). On July 6, 1971, Revader purchased a 6-month, $10,000 certificate of deposit (hereinafter certificate No. 3). This certificate was continually renewed until it was cashed on January 17, 1974. The parties did not establish a specific source of funds for the purchase of this certificate of deposit. On September 20, 1971, Revader purchased a 6-month, $5,000 certificate of deposit (hereinafter certificate No. 4). Funds available to purchase this certificate were $5,000 from a contractor's check issued to Revader on August 18, 1971. In summary, Revader purchased $25,000 worth of certificates of deposit (Nos. 2, 3, and 4) in 1971, of which amount $3,033.75 is traceable to a certificate purchased on December 15, 1970. [2] During 1971 Revader earned $389.82 in interest on the certificates of deposit. Dec. 1970 certificate
$37.80
Certificate No. 1
37.86
Certificate No. 2
123.29
Certificate No. 2 Renewal
124.81
(Sept. 13, 1971)
Certificate No. 4
66.06
$389.82
*121 In 1972 Revader purchased $20,000 in certificates of deposit, not including renewals of certificate Nos. 2, 3, and 4. On June 27, 1972, a 6-month, $10,000 certificate (hereinafter certificate No. 5) was purchased. This certificate was continually renewed until it was cashed on January 17, 1974. Funds available to purchase certificate No. 5 include two contractors' checks in the amounts of $8,254 and $2,040, which checks were dated June 21, and 22, 1972, respectively. A second 6-month, $10,000 certificate (hereinafter certificate No. 6) was purchased in 1972 on August 18. Funds available to purchase certificate No. 6 include a $9,038 contractor's check dated August 12, 1972. During 1972 Revader earned $1,423.55 in interest on the certificates of deposit purchased in 1971 and 1972: Certificate No. 2 Renewals: Dec. 12, 1971
$126.34
Mar. 12, 1972
264.55
Certificate No. 3
505.93
Certificate No. 4
273.06
Certificate No. 5
253.67
1,423.55
All of the interest paid on certificates No. 1 thru No. 4 was either credited to Revader's bank accounts or used to purchase new certificates. A check for the interest payable on certificate No. 5 was issued to *122 petitioners on December 27, 1972, which check was endorsed and deposited by Revader. No interest was paid during 1972 on certificate No. 6. Petitioners also had a savings account in which the following transactions were reflected for the taxable years in issue: Date
Deposit
Withdrawal
Source
Sept. 8, 1970
$6,000.00
Opening balance
Feb. 2, 1971
6,956.64
Contractors' checks
Oct. 10, 1971
5,200.00
Contractors' checks
Nov. 3, 1971
5,018.00
Contractors' checks
Jan. 1, 1972
150.44
Interest credited from
certificate No. 3
Jan. 6, 1972
255.07
Interest credited from
certificate No. 3
Jan. 12, 1972
$13,688.59
Jan. 18, 1972
5,000.00
Contractors' checks
Feb. 16, 1972
5,000.00
Contractors' checks
June 30, 1972
173.86
Interest credited from
certificate No. 3
July 6, 1972
250.86
Interest credited from
certificate No. 3
During 1972 interest (excluding that payable on the certificate No. 3 which was credited to this account) of $324.30 was paid on this account.Evidence was not presented as to interest paid during 1971. The $13,688.59 withdrawn from the account in January 1972 was used to *123 pay off the mortgage on petitioners' residence.
In addition to the foregoing sources of income, petitioners also owned rental property which they had purchased in 1971.This property generated gross rents of $375 in 1971 and $900 in 1972. Rental expenses on the property, exclusive of depreciation, totaled $258.50 in 1971 and $330.28 in 1972. Petitioner's joint Federal income tax returns for each of the taxable years in issue were prepared by Dalmain Price (hereinafter Price). Price had prepared petitioners' returns for 10 to 12 years prior to 1971. Revader had no complete set of books from which the returns could be prepared.Rather, he had a hodgepodge of written memoranda, Form 1099 informational returns received from contractors, and Forms 941 given to employees. Many of the figures used in preparing the returns were supplied by Revader from memory. Petitioners' tax returns for years prior to the years in issue were prepared in the same manner. During the preparation of petitioners' returns for each of the years, Price had a passive role. The information supplied by Revader was used without any questioning or cross-checking by Price. In reporting gross receipts from *124 the business for 1971, two sources of information were used, three Form 1099's received from contractors and a partial list prepared by Revader of checks received from contractors. Revader only received three Form 1099's from contractors during the year. These three forms reflected payments to Revader of $126,734.57 and the partial list of checks reflects payments of $84,161.13, for a total of $210,895.70. Duplicated on the partial list were $29,477.91 in checks which were included on a Form 1099. Also contained on the partial list was $16,725.58 in checks for which no payor was listed. Apparently, Revader or Price subtracted these two amounts from the $210,895.70 total in determining the $163.355.37 reported as gross receipts on the return for 1971. [3] As previously found, however, the parties have agreed that Revader received checks from contractors totaling $251,294.96 during 1971. Gross receipts of $283,589.30 were reported on the return for 1972. Petitioner had only one Form 1099 from a contractor, which form reflected *125 payments of $242,060.35. No explanation was offered as to the source of the information used in reporting gross receipts in excess of the amount shown on the Form 1099. As previously found, however, the parties have agreed that Revader received checks from contractors totaling $369,519.69 during 1972. In addition to underreporting gross receipts for each of 1971 and 1972, no amounts were reported as interest or as rents from the rental property.It was the business practice of the financial institutions in which Revader had deposited money in savings accounts and certificates of deposit to issue and mail Forms 1099 to customers who earned interest. Revader did not provide Price with any Forms 1099 received on account of any interest earned. Petitioners had reported interest income on the return filed for the previous taxable year. The parties have agreed that for each of the taxable years, Revader understated deductions for employees salaries and subcontractor expenses to the extent the amounts of all checks issued by Revader to his employees and subcontractors [4] exceeded the amounts claimed on his returns for wages and subcontractor expenses. *126 On the return for 1971, Revader deducted $15,878 for employees' salaries and $93,646.47 for payments to subcontractors. These were the same amounts as reported on the Forms W-2 and 1099 prepared by Revader. During 1971, however, Revader paid $16,587.27 to employees and $119,472.66 to subcontractors, and petitioners are entitled to deductions in those amounts. In total, Revader underreported these expenses by $26,535.26. On the return for 1972, Revader deducted $21,837.70 for employees' salaries and $158,957.60 for payments to subcontractors. Again, these were the same amounts as reported on the Forms W-2 and 1099 prepared by Revader. During 1972 Revader paid $26,677.75 to employees and $188,192.82 to subcontractors, and petitioners are entitled to deductions in those amounts. In total, Revader underreported these expenses by $34,075.17. [5]
On the returns filed for 1971 and 1972, respectively, taxable incomes of $3,448.17 and $8,159.96 were reported. In January 1973 Revader prepared *127 a net worth statement for his bank which showed a personal net worth of $224,700. Two years earlier in January 1971, Revader had prepared a similar net worth statement on which a net worth of $34,171.77 was shown. When Revader went to see Price prior to April 15, 1974, to prepare his 1973 income tax return he had with him and showed Price Forms 1099 reflecting interest paid to Revader in 1973 on certificates of deposit and savings accounts totaling $4,693.12. Price told Revader and Revader agreed that to earn the interest shown assets in excess of the amounts Revader could have purchased with the income reported on prior years' returns was required, and that Revader had probably underreported his taxable income in prior years. Revader acknowledged that he had had excess cash on hand during the years 1971 and 1972 and asked Price what he should do about it. Price advised him to try to get together records that would reflect his correct taxable income for the prior years and either bring them in for preparation of amended returns or wait for an expected audit by the Internal Revenue Service. Revader did not or was unable to put such records together and the revenue agent first *128 contacted Revader about his tax liability on July 8, 1974. In the statutory notice of deficiency, respondent determined, by use of the specific items method of proof, that Revader had gross receipts of $251,249.96 for 1971 and $369,519.69 for 1972 (the same amounts as subsequently [See Illustration in Original] OPINION Section 6653 (b) provides for the imposition of a 50-percent addition to tax if any part of any underpayment required to be shown on the return is due to fraud. There is no question that there were underpayments on petitioners' returns for 1971 and 1972. Sec. 6653(c). The principal issue for our decision is whether any part of the underpayments required to be shown on petitioners' returns for 1971 and 1972 were due to fraud on the part of Revader. Fraud is an act of intentional wrongdoing with the specific purpose to evade a tax believed to be owing. Cefalu v. Commissioner,276 F.2d 122, 128-129 (5th Cir. 1960); Brountas v. Commissioner,73 T.C. 491 (1979). Whether any underpayment is due to fraud is a factual question which must be answered based on the entire record. Fiorella v. Commissioner,361 F.2d 326 (5th Cir. 1966), *129 affg. a Memorandum Opinion of this Court.Respondent has the burden of proving the existence of fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Stoltzfus v. Commissioner,398 F.2d 1002 (3d Cir. 1968); Carter v. Campbell,264 F.2d 930 (5th Cir. 1959); Marcus v. Commissioner,70 T.C. 562 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. (1980). Although the existence of fraud cannot be imputed or presumed, its existence may depend to some extent on circumstantial evidence and reasonable inferences properly drawn from the record. Stone v. Commissioner,56 T.C. 213 (1971); Otsuki v. Commissioner,53 T.C. 96 (1969). The question of fraud in this case is a close one, especially with regard to the taxable year 1972. Based upon the record as a whole, however, we conclude that respondent has not established by clear and convincing evidence that any underpayment of tax was due to an act of intentional wrongdoing by Revader with the specific purpose to evade a tax believed to be owing. In making his case against Revader, *130 respondent portrays Revader as a successful business man who: (a) was aware of the income and expenses of his business and of the extent of his assets; (b) was capable, had he been so inclined, of keeping better books and records than those kept; and (c) was able, had he been so inclined, of accurately determining his taxes from the records which existed at the time his returns were prepared. Thus respondent argues, any shortcomings in the taxes reported by Revader must have been due to an intent to evade tax. Our impression of Revader does not coincide with the portrayal advanced by respondent. Revader may have been a successful businessman in terms of obtaining contracts to hang sheetrock and filling those contracts. We do not believe, however, and respondent has certainly not convinced us, that during the years in issue Revader was fully aware of the amount of income generated by the large contracts he obtained, was cognizant of the inadequacies of the manner in which he accounted for his business, and was acting with the intent to evade tax. Our overall impression of Revader is of a man who, from a tax-point of view, did not adequately manage his business during the years *131 in issue because of a dramatic increase in the volume of that business during those years and because he was generally unsophisicated in terms of accounting and tax matters. It is against this backdrop that we will discuss more specifically the arguments raised by respondent.
One of respondent's primary arguments in support of his fraud determination is that Revader underreported gross receipts by such large amounts for each of the years in issue that Revader must have known that he was underreporting income. Moreover, respondent asserts that Revader also purposely understated expenses for each of the years in order not to show losses as a result of underreporting gross receipts. As additional evidence of fraud, respondent notes Revader's failure to report any interest or rental income. The parties have stipulated as to the amount of gross receipts, as measured by the contractors' checks, of Revader's business. It is undeniable that Revader understated gross receipts by a considerable amount. As respondent acknowledges, however, a substantial understatement of income is not sufficient alone to support a finding of fraud. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cor. 1962), *132 affg. a Memorandum Opinion of this Court. Despite the omission of large amounts of gross receipts, we do not believe that Revader intentionally under-reported them. Prior to the years in issue, Revader had a low-volume business, working principally for one contractor, and he was in a poor cash-flow position. His haphazard manner of disposing of contractors checks and keeping records may have been adequate for years prior to 1971. But rather suddenly, perhaps due in part to the Government's insistence that minority groups receive a fair share of Government contracts, Revader's business increased dramatically, so that in 1971 and 1972 he was working with a number of different contractors on several jobs at the same time and his gross receipts as well as his business expenses increased accordingly. He was not equipped to properly account for this increase in income and expenses, and probably had no time to do it in any event. Despite his increase in income he remained in a rather poor cash position at least for a part of 1971 because he had to pay his subcontractors and employees before he received full payment from his contractors. As a consequence he took advantage of Darenbourg's *133 offer to hold his payroll checks for a week to 10 days until Revader could collect from his contractors and redeem the uncashed payroll checks. As a result, often neither the contractors' checks used to redeem the payroll checks nor the payroll checks themselves were entered on petitioner's records. It may have been negligent on petitioner's part not to increase his accounting capacity when his business increased but we do not think it proves fraud. There is no evidence to indicate that Revader was attempting to conceal gross receipts when he disposed of various contractors' checks in the way he did. No correlation exists between the manner in which a particular check was disposed of and whether that check was included within the gross receipts reported. Some were deposited in his bank account, some were used to redeem payroll checks, some were used to purchase CD's, and some were apparently converted into cash. We cannot be sure which checks were used for which purposes. While we recognize that all of these checks should first have been entered on petitioner's records, such was not done for the reasons discussed, and there was no pattern of use of certain checks that would *134 suggest an intent to conceal gross receipts. All of his receipts were paid by check and those checks were available to anyone who wanted to check petitioner's gross receipts. It is unfortunate that this was not done each year by a competent accountant but we are not convinced that petitioner realized it should have been done, absent a complete set of books. We find no merit in respondent's suggestion that Revader purposefully understated expenses for each of the years in order not to show losses because of the under-reported gross receipts. In general we accept petitioner's exolanation that some of his payroll checks that were redeemed and some of the wages he was required to pay in cash did not get on his records. Had it been Revader's intent to underreport income, it would have made more sense to arrive at the same amount of adjusted gross income by reporting a larger amount of gross receipts and all expenses. We believe Revader's failure to deduct all expenses is but an indication of the inadequacy of his accounting knowledge and practices. Respondent also argues that sufficient information existed with which to prepare accurate returns had Revader been so inclined. This *135 argument is premised on the ability of respondent's agents to use whatever information Revader gave them as a starting point and to trace from there until an accurate income picture was developed. This overlooks the fact that respondent's agents were sophisticated tax auditors while petitioner had very little education and none in accounting and relied on a person to prepare his tax returns who played only a passive role and made no effort to check the figures petitioner gave him although some of them were given orally from memory. Price apparently did not even suggest to petitioner that his figures might be wrong until April of 1974 and respondent's agent first visited petitioner on July 8 of that year. Respondent also points to other circumstances which, he argues, either evidence an intent to evade tax or were of such a nature that they must have alerted Revader to the fact that he was not reporting all his income. Included among these are: (a) The certificates of deposit purchased and savings account deposits made by Revader; (b) petitioners' failure to report any interest income for either 1971 or 1972, although they did so for 1970; (c) satisfaction of the outstanding mortgage *136 on petitioners' home; and (d) the net worth statement prepared by Revader in January 1973 showing a substantial increase over that shown on a statement prepared in January 1971. It is true that the increase in petitioners' assets and cash flow should have alerted Revader to the fact that he might be underreporting his taxable income, particularly by the end of 1972, and he admitted on the witness stand that he realized his financial position had improved by 1972, but he also testified that he did not realize the implication of it until Price called it to his attention in 1974. This is plausible for someone not versed in tax accounting who was in over his head in managing the financial affairs of his business. With reference to the unreported interest we note that with one exception all of the unreported interest on petitioners' savings accounts was credited to their bank accounts and the interest on the CD's was applied toward the purchase price of another CD. Revader may not have recognized such credits as interest income to him but he undoubtedly was sent Form 1099's reflecting such interest by the banks. Whether Revader did not receive the 1099's, misplaced them, or simply *137 overlooked them, we do not know and his testimony is also vague on the subject. But here again failure to report income on which the Government has notice is hardly indicative of an effort to evade taxes on that income except by someone rather stupid. The factors noted by respondent are, under the circumstances of this case, as easily explainable by the condition of Revader's business and his lack of understanding of tax matters as by an intent to evade tax. Nor does any other evidence relied on by respondent convince us. We find of no import Revader's "failure" (to use respondent's word) to provide various information to Price for use in preparing the returns in issue. From the evidence presented, we were not impressed with the quality of the services which Price performed for Revader. Apparently, Price used whatever information Revader happened to have with him without questioning Revader as to the accurracy or completeness of that information. Thus, Revader's "failure" to provide various information to Price was a result of Revader's lack of knowledge about what information was required and of Price's "failure" to question him, rather than of an attempt to conceal income *138 and evade tax. The evidence introduced concerning Revader's cooperation, or lack thereof, with the Internal Revenue Service special agents investigating petitioners' returns provides little indication of the existence of fraud. Considerable testimony was given at trial concerning meetings in 1974 between the agents and Revader during the investigation of petitioners' income tax returns. The focus of this testimony was whether Revader was cooperative and straight-forward or whether his explanations of petitioners' returns were inconsistent with later statements. Of course, the parties disagree as to what actually occurred. Based on the testimony given, it is not clear to us exactly what the agents told Revader when they began their investigation. There is some indication that the agents first told Revader they were investigating his employment tax returns. If that is what Revader understood the agents to be investigating, it is understandable that his statements at that time may have been confusing and not consistent with later statements. Believing this evidence to be of little value, factual findings with regard thereto have not been made. In summary, we recognize that *139 many of the factors present in the instant case were present in other cases where a finding of fraud has been made.See for example, Webb v. Commissioner,394 F.2d 366 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Merritt v. Commissioner,supra. As those cases point out, however, each case must be decided on its own facts. For the most part we believe Revader's testimony as to the circumstances in which he found himself during the years in issue, the manner in which he conducted his business, and his lack of accounting and tax acumen. However, the question is close for 1972, by which time we believe Revader should have realized that with the increase in his business income he needed better accounting records and because of his increase in net worth he was probably not reporting all of his income. But use of poor judgment does not equate into an intent to evade tax. Respondent must prove fraud by clear and convincing evidence and when the issue is in doubt it should be resolved in favor of the taxpayer. The evidence presented in this case does not convince us that Revader acted with the intent to evade tax. We hold for petitioners *140 on the fraud issue for both years. Cash Business Expenses
The second issue for decision is whether Revader is entitled to an additional business expense deduction for 1972 for wages paid in cash. Revader has the burden of establishing the cash amounts paid for wages. Rule 142(a), Tax Court Rules of Practice and Procedure.
We have found as a fact that Revader hired pieceworkers to work on weekends during 1972 and that these pieceworkers were paid in cash. Revader claims that the total amounts paid to these pieceworkers equal the $25,442.27 amount which respondent's analysis of Revader's disposition of contractors' checks showed to be available in 1972.We cannot accept this as sufficient evidence to support the claim that cash wages of $25,442.27 were paid. Some of this cash may have been used for living expenses or may have been on hand at the end of 1972. We do believe, however, that wages were in fact paid in cash in 1972. Both Revader and several of his employees so testified. Revader also testified that he used the contractors' checks cashed at the Pink Palace and elsewhere during 1972 to obtain the cash to pay the wages. Applying Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), *141 and bearing against Revader whose inexactitude is of his own making, we conclude that Revader paid cash wages in the amount of $10,000 during 1972 and is entitled to an additional deduction for that year in that amount. This estimate is based largely on Revader's testimony with respect to the demands of his contractors for bringing his work up to schedule, the necessity for hiring pieceworkers who insisted on being paid in cash, and the number of workers he hired and the wages he paid--all discounted to a considerable degree by an almost complete lack of substantiation. Decision will be entered under Rule 155. Footnotes
1. On brief, petitioners claim a deduction of $25,442.27 for wages paid in cash, this amount being the same as that which respondent's analysis of Revader's disposition of contractor's checks shows was available for 1972.↩
2. Certificate No. 1 is not separately included in the total amount since it was used to purchase certificate No. 2 and is also traceable to the Dec. 1970 certificate.↩
3. In determining gross receipts an arithmetical error was made since $210,895.70 less the two amounts from the partial list results in $164,692.21.↩
4. Included within the payments to subcontractors were payments to pieceworkers.↩
5. Still at issue is whether an additional deduction is allowable for wages and/or subcontractor fees paid in cash to pieceworkers who worked on weekends and insisted on being paid in cash.↩