LOUIS P. WEIL and BEATRICE WEIL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Weil v. Commissioner
Docket No. 36115-83
United States Tax Court
T.C. Memo 1990-414; 1990 Tax Ct. Memo LEXIS 431; 60 T.C.M. (CCH) 407; T.C.M. (RIA) 90414; August 6, 1990, Filed *431 Decision will be entered under Rule 155. Karl K. Ransom and Kenneth Moscaret, for the petitioners. Henry E. O'Neill, for the respondent. PARKER, Judge. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in, and additions to, petitioners' Federal income tax as follows: Addition to Tax Year
Deficiency
Section 6653(b) *
1971
$ 110,371
$  55,186
1972
455,042
227,521
1973
575,864
296,896
Unless otherwise indicated, all section *432 references are to the Internal Revenue Code, as amended and in effect for the years before the Court, and all rule references are to the Tax Court Rules of Practice and Procedure. The principal issues are whether petitioners had unreported income resulting in underpayments of tax each year and whether such underpayments of tax were due to fraud on the part of petitioner Louis P. Weil under section 6653(b). FINDINGS OF FACT A few of the facts were stipulated and are so found. The stipulations of fact and the exhibits attached thereto are incorporated herein by this reference. Petitioners Louis P. Weil and Beatrice Weil are husband and wife, and at the time of filing the petition herein resided in Coronado, California. Petitioners filed joint Federal income tax returns for the taxable years 1971 through 1973. All references to petitioner in the singular will be to petitioner Louis P. (Phillip) Weil. Petitioner's Job with KCI
During the years 1971, 1972, and 1973, petitioner was the president of Koratec Communications, Inc., a subsidiary of Koracorp Industries, Inc. Koracorp Industries, Inc. (hereinafter referred to as "Koracorp") was a publicly held corporation *433 engaged primarily in the apparel business, whose stock was traded on the New York Stock Exchange. Below Koracorp was Koracorp Management Company which managed three divisions or "uni-centers," as they were called. Those three uni-centers were women's wear, men's wear, and Koratec, Inc. Koratec, Inc. itself was a management company for all of the subsidiaries other than women's wear and men's wear, including Koratec Communications, Inc. Koratec Communications, Inc. (hereinafter referred to as "KCI") began as an in-house advertising agency, but when Koracorp decided to publish the magazine, "Homemaking with a Flair," the magazine was placed in that company. Petitioner first became associated with KCI about 1969. At that time he and another individual approached Arthur Cunningham (hereinafter referred to as "Cunningham"), the president of the Koratec uni-center and vice president and director of Koracorp, with an idea for Koracorp to publish a promotional magazine known as "Homemaking with a Flair." "Homemaking with a Flair" was originally intended to be a magazine with recipes, household hints, and advertising and/or coupons for various products. Later the magazine developed into *434 an envelope filled with various inserts and coupons that was mass mailed throughout the United States, eventually going to some 20 million homes. Cunningham was receptive to the magazine idea, and after the proposal was approved by the parent company, KCI became the publisher and producer of "Homemaking with a Flair." In February 1969, petitioner and KCI entered into an employment agreement whereby KCI agreed to publish and circulate "Homemaking with a Flair" and to employ petitioner to produce the magazine. His principal duties were to sell advertising space, including coupons and other inserts, and to produce and mail the magazine. Petitioner was to devote his exclusive and full-time services to KCI during the term of the employment agreement. The agreement provided, inter alia, that petitioner would not engage in or be interested in (directly or indirectly through participation in the ownership management or operations of any partnership, association, corporation, or company), or act as a consultant to, any business which is competitive with any business of [KCI] or any of its affiliated companies, including, without limiting the generality of the foregoing, the Homemaking *435 Booklet project.
The initial term of the agreement was February 1, 1969, until December 31, 1970. Thereafter the employment contract was to continue until terminated in writing. KCI had the right to terminate the contract if it determined that the "Homemaking with a Flair" booklet was uneconomic to publish. Petitioner's initial compensation for the period February 1, 1969, to December 31, 1969, was $ 3,000 a month. Thereafter, he was to receive a commission based on the gross sales of space and coupons in "Homemaking with a Flair" equal to the following: five percent up to $ 500,000; three percent in excess of $ 500,000 up to $ 1 million; and one percent of such receipts in excess of $ 1 million. Petitioner was also entitled to a two percent override on sales made by independent sales representatives. Originally the commissions were based upon reported sales as they were accrued on KCI's books, but at some point this was changed so that petitioner was paid commissions only after KCI had actually been paid for the advertising space or coupons. Also at some point petitioner's status may have been changed from that of an employee to that of an independent contractor, *436 but for the three years involved in this case petitioner received both W-2 wage income and non-wage income from KCI. As president of KCI, petitioner had total responsibility for sales, production, and distribution of "Homemaking with a Flair." He also had authority and control over KCI's financial operations. During the years before the Court, Norman Pinsky was the vice president of KCI. Petitioner caused the controller for Koratec, Inc., Jay Fleischmann, to create an internal accounting designation (account No. 55) for "unbilled receivables." Petitioner then provided Jay Fleischmann with a list of the figures for unbilled receivables for each issue of "Homemaking with a Flair." Unbilled receivables as well as billed receivables were treated as income to KCI. However, when KCI began to encounter delays in payments for the advertising or outright cancellations of such recorded sales, the method of payment of petitioner's commissions was changed, as indicated above, so that he got paid only after KCI got paid. Petitioner was not happy with this change. Petitioner's Companies
Prior to and during the years 1971, 1972, and 1973, petitioner had established various corporate *437 and partnership entities, including Verve, Inc. (Verve), Associated Graphics, Inc. (Graphics), Allison Production Affiliates, Inc. (Allison Production), Western Gateway Corporation (Western Gateway), Paradise Found, Ltd., Gateway Foods, Rainbow Production, and Hawaiian Fragrances (hereinafter referred to as "petitioner's companies"). Kickbacks and Diversions of KCI's Funds: Direct Mail
In performing his duties for KCI, petitioner had occasion to deal with representatives of various companies whose services were used in the production and mailing of "Homemaking with a Flair." One such company was Direct Mail Company of America (Direct Mail), which was in the business of performing mass mailings to different areas of the country. Direct Mail handled the mailings of "Homemaking with a Flair," which involved mailing millions of pieces of mail for KCI. Direct Mail folded the materials and labeled and stuffed the envelopes, and was compensated at the rate of so many dollars per thousand items mailed. Petitioner directed Norman Pinsky (hereinafter referred to as "Pinsky") to present various invoices to Direct Mail requesting payments for various services allegedly performed *438 by petitioner's companies, Verve, Allison Production, Graphics, and Western Gateway. The bookkeeper for Direct Mail, Valerie Price, both typed the invoices for petitioner's various companies on the premises of Direct Mail and issued the checks in payment of the invoices. [1] These invoices listed specific services rendered such as hand inserting and folding, hand processing and resealing envelopes, folding plastic bags, and processing and handling plastic bag inserts. None of the services set forth in the invoices was performed by any of petitioner's companies or by petitioner himself. *439 No services were rendered to Direct Mail in connection with these payments to petitioner's various companies. In 1971 Direct Mail issued a check to Verve in the amount of $ 3,000. In 1972 Direct Mail issued checks to petitioner's various companies in the total amount of $ 167,000: $ 54,675 to Verve; $ 27,325 to Allison Production; $ 52,000 to Graphics; and $ 33,000 to Western Gateway. In 1973 Direct Mail issued a check or checks to Western Gateway in the amount of $ 16,000. In early 1973 the U.S. Postal Service initiated an investigation of Direct Mail's activities to determine if it was defrauding the United States, and Direct Mail's dealings with petitioner apparently terminated about that time. The source of the funds to make the above payments to petitioner's companies was money paid to Direct Mail by KCI for services purportedly performed by Direct Mail on "Homemaking with a Flair." Direct Mail simply reduced the number of articles it actually mailed, i.e., KCI paid for a greater number of mailings than it actually received and Direct Mail used the balance of KCI's payments to fund the payments that were being made to petitioner's companies. In other words, petitioner *440 received "kickbacks" from Direct Mail out of funds that KCI paid for mailing services it did not receive. Payments to Petitioner's Companies: Calmark Mailing
Another company that petitioner dealt with in the production of "Homemaking with a Flair" was Calmark Mailing Service (Calmark Mailing). During the years 1971, 1972, and 1973, Calmark Mailing also performed inserting and mailing services for "Homemaking with a Flair." At petitioner's direction, Pinsky, as he had done in the case of Direct Mail, presented Calmark Mailing with numerous invoices from Verve, Allison Production, Graphics, and Western Gateway. In 1971 Calmark Mailing issued checks to Verve in the total amount of $ 31,600. In 1972 Calmark Mailing issued checks to petitioner's companies in the total amount of $ 76,000: $ 17,000 to Verve; $ 9,000 to Allison Production; $ 40,000 to Graphics; and $ 10,000 to Western Gateway. In 1973 Calmark Mailing issued checks and made wire transfers of money to petitioner's companies in the total amount of $ 165,000: $ 69,000 to Verve; and $ 96,000 to Western Gateway. Some of the invoices for these various payments were made up after the checks (or wire transfers) had *441 already been issued (or made). In 1972 Pinsky performed a plant survey and analysis for Calmark Mailing. At the direction of petitioner, Pinsky presented Calmark Mailing with two invoices, directing that payment be made to Verve. The first invoice was dated February 11, 1972, in the amount of $ 8,458 for "Phase I-Plant Survey," and that amount was paid to Verve. The second invoice was dated March 11, 1972, in the amount of $ 8,542 for "Phase II-Plant Survey Analysis," and that amount was also paid to Verve, for a total of $ 17,000 paid to Verve in 1972. On the same date as the above two payments, Calmark Mailing also issued a third check in the amount of $ 9,000 payable to Allison Production, allegedly for "warehouse survey and recommendations." The purpose of the $ 9,000 payment was for brokerage or finder's fees. None of these three payments was entered on the books and records of Verve or Allison Production, and none of these funds was reported as income on the income tax returns of either Verve or Allison Production. Apart from the two checks for Pinsky's plant survey and the $ 9,000 check above, the record does not establish whether the payments from Calmark Mailing were *442 kickbacks or were actually commissions or finder's fees earned by petitioner. In either event, neither petitioner nor his companies kept proper records of these payments or reported these payments on their tax returns. Kickbacks and Diversions of KCI's Funds: Western Lithographing
Another company that petitioner dealt with in the production of "Homemaking with a Flair" was Western Lithographing Company (Western Lithographing). Western Lithographing was a large commercial printing business. From 1965 until 1971, the president and general manager of Western Lithographing was Sid Hersh, who was also a shareholder. In 1971, after Western Lithographing merged with Diamond International, Sid Hersh (hereinafter referred to as "Hersh") became the general manager and vice president of the Graphic Arts Division of Diamond International. Petitioner had originally approached Hersh in 1969 about the possibility of Western Lithographing financing "Homemaking with a Flair." Hersh declined and petitioner thereafter made his arrangements with Koracorp and its subsidiary, KCI. Subsequently, Western Lithographing and KCI entered into a contract for Western Lithographing to do the printing *443 for "Homemaking with a Flair." In order for Western Lithographing to obtain and retain the printing contract for the magazine, petitioner required Western Lithographing to make payments (kickbacks) to his companies. Invoices from his companies were usually hand-delivered by either petitioner or Pinsky acting on petitioner's instructions. In 1971 Western Lithographing made payments totaling $ 160,859 to Verve and $ 10,000 to Allison Production. In 1972 Western Lithographing made payments to petitioner's companies totaling $ 65,000: $ 10,000 to Verve; $ 10,000 to Graphics; $ 9,600 to Western Gateway; and $ 35,400 to Allison Production. In 1973 another printing company had the contract to print "Homemaking with a Flair," and it too made payments totaling $ 30,000 to Western Gateway. Two of Western Lithographing's 1972 payments ($ 10,000 to Graphics and $ 9,600 to Western Gateway) represented commissions petitioner earned in helping Western Lithographing obtain some business from Grolier Enterprises. However, the rest of the payments from Western Lithographing were kickbacks to petitioner. The kickbacks were funded by overbilling KCI for the printing work on "Homemaking with *444 a Flair." Hersh, acting on petitioner's instructions, submitted inflated bills to KCI, and the excess funds from these overbillings were paid to petitioner's various companies. Petitioner's companies performed no services to earn these payments. Neither petitioner nor his companies reported the payments as income on their tax returns. Kickbacks and Diversions of KCI's Funds: Geller Associates
Another company that petitioner dealt with in the publication of "Homemaking with a Flair" was David Geller Associates, Inc. (Geller Associates). Geller Associates was a publisher's representative selling advertising in newspapers and magazines. It was employed by publishers to sell advertising, for which service Geller Associates received a commission. Geller Associates was located in New York City. Milton Shapiro was both an officer and an owner of the company, and his primary contact with KCI was petitioner. During the years 1971 through 1973, Geller Associates sold advertising for KCI in "Homemaking with a Flair." When Geller Associates sold advertising in "Homemaking with a Flair," it collected the money from the advertising purchaser, deducted its commission, and then the *445 balance was owed to KCI. During 1971, 1972, and 1973, Geller Associates made numerous payments to petitioner's companies and to petitioner himself. These payments were made to petitioner's companies at petitioner's direction and often in response to invoices from his various companies. None of these companies (Verve, Western Gateway, Graphics, or Allison Production) ever performed any services for Geller Associates. Geller Associates, at petitioner's direction, also made payments to third parties for the benefit of petitioner. These payments to third parties included payments to a travel agent and to the collection agent for Caesar's Palace in Las Vegas, Nevada. A portion of the payments from Geller Associates represented commissions to petitioner for business he referred to Geller Associates in connection with "Homemaking with a Flair." However, the remainder of the payments to petitioner, to his companies, or to third parties for his benefit was from the funds collected by Geller Associates from advertisers with respect to the sale of advertising in "Homemaking with a Flair," which funds were owed to KCI. In other words, at petitioner's instructions, monies due and owing *446 to KCI were diverted to petitioner, to his companies, or to his creditors. Geller Associates made payments as described above, in the total amounts of $ 21,232 in 1971, $ 421,256.99 in 1972, and $ 508,000 in 1973. Most of the payments in 1971 represented commissions earned by petitioner, but $ 10,000 was paid to Verve which rendered no services. Payments of $ 42,500 to petitioner in 1972 represented commissions earned by petitioner. Four checks totaling $ 42,500 were made payable to petitioner personally and he received, signed, and negotiated those checks. Geller Associates issued a Form 1099 to petitioner for those commissions, but the Form 1099 erroneously listed the amount as $ 17,500. Most of the payments in 1972 and 1973, however, were monies due and owing to KCI that petitioner caused Geller Associates to improperly divert to petitioner, to his companies, or to third parties for his benefit. Petitioner's Use of Kickbacks and Diverted KCI Funds for Gambling Debts and other Personal Purposes
On March 1, 1971, a savings account was opened at the McGehee bank in McGehee, Arkansas in the name of Beatrice Dolores Albright (Mrs. Weil). [2] On October 30, 1972, Geller *447 Associates check No. 14063, payable to Verve, in the amount of $ 9,956 was deposited into that savings account. The check payable to Verve was ostensibly for printing brokerage. This check was never recorded as income on the books and records of Verve. On December 4, 1972, Geller Associates check No. 14419 in the amount of $ 7,000 (payable to Allison Production and ostensibly for commissions) was deposited into the savings account. This check was never reported as income on the books and records of any of petitioner's various corporations. Neither of these checks was reported as income by petitioners. On May 9, 1973, the total balance of $ 20,490.05 was withdrawn, and the savings account was closed by issuance of a cashier's check in that amount payable to Beatrice Dolores Albright. That cashier's check was endorsed "Beatrice Dolores Albright" "payable to Western Gateway Corporation." The cashier's check was deposited into the bank account maintained in the name of Western Gateway at First Hawaiian Bank. The books and records of Western Gateway reflect that the check was used to reduce the accounts receivable balance "owing" from petitioner to the corporation, account No. 112. *448 On November 5, 1971, petitioner and his wife purchased a residence located at 4369 Royal Place, Honolulu, Hawaii, for $ 310,000. The sales agreement called for the purchase price to be paid with a $ 60,500 down payment and installments of $ 75,000 due April 15, 1972, another $ 75,000 due October 15, 1972, $ 44,750 due April 15, 1973, and the final payment of $ 54,750 due October 15, 1973. The agreement called for an eight percent interest rate on the declining balance of the principal amount. Title to the property was taken in the name of the petitioners. A checking account in the name of Graphics was maintained at the Bank of Hawaii, account No. 038447. The signature card reflects Harry Hinchey, Mrs. Weil's brother-in-law, as the president and Beatrice Dolores Albright (Mrs. Weil) *449 as vice president. Harry Hinchey, as president, was authorized to write checks only up to $ 500. Mrs. Weil, as vice president, was authorized to write checks in any amount. On April 15, 1972, Mrs. Weil drew a check on the bank account of Graphics in the amount of $ 29,000. The check was payable to Bea A. Weil, and she signed the check Beatrice Albright. The check was deposited into a checking account maintained under the name Bea A. Weil at Wells Fargo Bank in San Mateo, California, on April 17, 1972, and those funds were used as part of the payment of the installment then due on the Royal Place property. On October 2, 1972, Harry Hinchey deposited $ 83,500 into the Graphics checking account at the Bank of Hawaii. That deposit included a Calmark Mailing check in the amount of $ 40,000 and a Direct Mail check in the amount of $ 42,000. These funds were used to make the installment then due on petitioners' house at 4369 Royal Place. On April 11, 1973, a Western Gateway check in the amount of $ 50,000 was issued to Beatrice A. Weil. The check was charged on the books and records of Western Gateway to account No. 112, Accounts Receivable Employee. This check was deposited into *450 Mrs. Weil's checking account at Wells Fargo Bank in California, and the funds were used to make the next installment payment due on the house at Royal Place. In other words, the kickbacks and diverted KCI funds that petitioner had caused to be paid to his various corporations were used to pay for the Royal Place property in Hawaii. In July of 1972 a rental lease covering 4369 Royal Place was entered into, with petitioner listed as the landlord. However, at some point his name was crossed off by someone and the name of Graphics was written in by hand. The term of the lease was for six months, commencing August 1, 1972, with rental of $ 3,000 per month. The lease was executed by Harry Hinchey, whose title was listed as president of Graphics. However, on their 1972 income tax return, petitioners claimed a rental loss of $ 48,064.76 with respect to the Royal Place property. From at least the period of October 15, 1971, through November 12, 1974, petitioner maintained a line of credit at Caesar's Palace in Las Vegas, Nevada. His address as reflected on the credit records of Caesar's Palace was listed as 4369 Royal Place, Honolulu, Hawaii. The credit records reflected the various *451 balances due Caesar's Palace and payments made to Caesar's Palace. Included among the payments of petitioner's personal gambling debts were the following checks: Date
Amount
Source of Payment
04/09/72
$ 17,975
Direct Mail check
#8130 payable to
Verve, endorsed to
California Clearing
Corp.
08/23/72
5,000
Geller Associates
check #13538 payable
to P. Weil, endorsed
to Caesar's Palace
11/15/72
15,000
Geller Associates
check #14179 payable
to California
Clearing Corp.
06/13/73
5,000
Western Gateway
check payable to
cash, endorsed to
Caesar's Palace
09/30/73
13,900
Western Gateway
check payable to
California Clearing
Corp.
10/20/73
6,800
Western Gateway
check payable to
California Clearing
Corp.
For example, on September 30, 1973, a counter check drawn on Western Gateway's account at First Hawaiian Bank was issued by petitioner to California Clearing Corporation in the amount of $ 13,900 and was used to pay his gambling debt to Caesar's Palace. The books and records of Western Gateway do not reflect that this check was *452 ever charged to petitioner's account No. 112, i.e., this $ 13,900 was never shown as an amount owed by petitioner to Western Gateway. Thus, petitioner used some of the kickbacks and diverted KCI funds to pay this and other personal gambling debts, as listed above. Verve as Petitioner's Deep Pocket for the Kickbacks and Diverted Funds
Verve was a California corporation, incorporated July 17, 1970. From August 1, 1970 to December 31, 1971, Lloyd Tucker (hereinafter referred to as "Tucker") served as the president of Verve. Tucker was never anything more than a figurehead president for Verve, "operating" the corporation out of his apartment and merely issuing checks for various personal expenses of petitioner and his family, including payments for their maid and Mrs. Weil's clothes. Mrs. Weil was listed as the secretary-treasurer of Verve under the name Beatrice Dolores (or B. D.) Albright. Mrs. Weil received $ 1,500 a month in salary, but performed no services for the corporation. Petitioner was not an employee of the corporation. Pinsky's wife was listed as an employee of Verve with the title of sales manager. She also received a salary and rendered no services. *453 Pinsky family expenses were also paid out of Verve's bank account. The various personal expenses of the Weils and the Pinskys that Tucker paid from the Verve bank account included Mastercharge expenses incurred before the formation of Verve, automobile payments, liquor store bills, clothing bills (primarily Mrs. Weil's), and travel expenses. Verve bank account funds were also used to make a $ 15,000 payment on the purchase of a Maserati automobile titled in petitioner's name. During the time that Tucker held the title as the president of Verve, he was unaware of any business being carried on by the corporation. During Tucker's tenure at Verve, the primary source of funds to Verve was Western Lithographing. The amount of money received was over $ 10,000 a month, totaling $ 160,859 during 1971. From time to time during this period, Pinsky, at the direction of petitioner, would give Tucker and his wife various invoices to type and send to Western Lithographing. The invoices bore notations such as services rendered, layout assistance, and commissions. Tucker had no knowledge of any services being rendered, layout assistance being given, and had no knowledge as to what the alleged *454 commissions were for. In many instances, payments had already been received from Western Lithographing and Tucker and his wife would type up a number of invoices to go back to Western Lithographing to cover the checks already received. Tucker understood that the payments from Western Lithographing represented the difference between what it charged KCI or Koracorp and the actual price of the printing work, i.e., "kickbacks." Tucker's understanding was correct and was borne out by the sworn testimony of Sid Hersh in this regard. The record establishes and the Court finds that Verve was nothing more than petitioner's incorporated pocket through which the various kickbacks and diverted KCI funds were channeled to petitioner, Pinsky, and their families. Reconstruction of Books and Records for the Shell Corporations
Ronald McCulloch (hereinafter referred to as "McCulloch") became involved with Verve and petitioner sometime around June of 1972. He assisted petitioner in the formation of Western Gateway, which he (McCulloch) understood to be organized specifically to be a holding company. No other business or service was ever performed by Western Gateway. McCulloch's signature *455 appears on the 1972 income tax return for Allison Production, the income tax return for Graphics for the period February 8, 1972 through September 30, 1972, and the income tax return for Western Gateway for the period July 3, 1972 through September 30, 1972. McCulloch had no knowledge of the function or business purpose of Allison Production. Although McCulloch signed the return for Graphics in the capacity of executive vice president, the only thing he knew about Graphics was that the corporation handled a piece of real estate that petitioner owned in Hawaii, specifically 4369 Royal Place. At the time McCulloch came to Hawaii, petitioner and his family were residing in the house on Royal Place. With respect to payments received by petitioner's various corporations from Geller Associates, McCulloch had no knowledge as to the reason for the payments. Petitioner instructed McCulloch as to the manner in which these payments were to be recorded in the books and records of the various corporations. The funds received by petitioner's various corporations from the various payors such as Geller Associates, as described above, were utilized by petitioner to invest in various business *456 enterprises of petitioner such as Hawaiian Fragrances, Gateway Foods, and Paradise Found. McCulloch likewise was not familiar with any business activity conducted by Verve. During his association with Western Gateway between June of 1972 and June of 1973, McCulloch met frequently with petitioner and was in touch with him on almost a daily basis. With respect to anything that had to do with money, petitioner carefully instructed McCulloch as to what he wanted McCulloch to do. There was no question in McCulloch's mind that Western Gateway was petitioner's company and that he (McCulloch) was an employee and was to carry out petitioner's instructions. In late 1972 Sherry Lusk was hired as a bookkeeper for Western Gateway. In 1973 she assisted in setting up accounting books (cash receipts journal, cash disbursements journal, general ledger, and payroll records) for petitioner's various companies, including both the active operating companies and the other corporations such as Verve. These books were made up after the fact and generally reflected what the bookkeeper was told to put in the books. For example, the checks from Direct Mail were entered as payments for printing commissions *457 consistent with the explanation petitioner gave to the Postal Inspector investigating Direct Mail. See n.1, supra. However, Direct Mail check No. 8130 dated April 3, 1972, in the amount of $ 17,975, was issued to Verve allegedly for folding plastic bags. That check was ultimately paid over to California Clearing Corporation, a business utilized by Caesar's Palace in Las Vegas, Nevada for collection services. The proceeds of check No. 8130 were used to pay off gambling debts incurred by petitioner at Caesar's Palace. This check was never reflected as income received by Verve even in its after-the-fact reconstructed books and records. Some of the other Direct Mail checks made payable to Verve were not entered on the Verve books as income but were shown as advances to Verve by Mrs. Weil. After petitioner was contacted by the Postal Inspector in April of 1973 and was questioned about these particular checks, petitioner caused an amended income tax return for Verve to be prepared and filed, an amended return reporting the amount of these checks as income to Verve. Edison C. Robinson (hereinafter referred to as "Robinson") was an accountant employed by petitioner and Western *458 Gateway from approximately March of 1973 through the middle of December of 1973. During his tenure with Western Gateway, Robinson held the positions of comptroller and vice president of finance. As such, he was familiar with the corporate structure of Verve, Western Gateway, Graphics, Allison Production, and petitioner's various other entities (the active, operating companies). The basic structural organization was that Western Gateway was a parent holding company and all the other companies were wholly owned subsidiaries. Rainbow Production was a subsidiary that had, as its subsidiaries, Hawaiian Fragrances, Gateway Foods, and Paradise Found. Paradise Found was a partnership, but all of petitioner's other entities were corporations. Robinson had no personal knowledge as to the purpose, function, or any services performed by Verve and Allison Production. His understanding of Graphics was that it operated the property at 4369 Royal Place. To Robinson's knowledge, petitioner was the owner of Western Gateway. Robinson had the overall responsibility for maintaining the books and records of Western Gateway and petitioner's other companies. During the time Robinson was associated *459 with Western Gateway, and in connection with entries made on the books of Western Gateway in regard to payments coming into the corporations, the persons providing him with information with respect to these payments were either petitioner or McCulloch. Most of the time petitioner himself provided Robinson with information over the telephone, since it was Robinson's understanding that the revenues were primarily generated by mainland operations run by Pinsky. Robinson's understanding of the payments received by Western Gateway between March of 1973 and December of 1973 was that they represented payments for "printing brokerage." However, Robinson was not aware of any corporate employee or employees who provided such brokerage services. Robinson understood that the payments received from Western Lithographing, Calmark Mailing, Direct Mail, and Geller Associates represented commissions for printing brokerage. He got this understanding either from McCulloch or petitioner. McCulloch himself had no personal knowledge of the facts, but petitioner knew the payments represented kickbacks to him or KCI funds improperly diverted to him or his companies. With respect to any invoices prepared *460 by Robinson during the period of time he was associated with petitioner's companies in regard to charges for purported printing brokerage commissions, information as to the amount put on the invoice came from petitioner. At the time Robinson became associated with the companies in March of 1973, petitioner's various companies had never been treated as a consolidated group and the tax returns for the various companies had never been filed and were approximately a year delinquent. One of Robinson's jobs was to try to create a record system that was consistent with the information then available regarding the finances of the companies. In many instances, checks had been received by the companies prior to an invoice being prepared and sent to the payor. When petitioner hired Robinson to organize books and records for the various companies, he told Robinson that he wanted somebody who would be able to do it "fast." None of the active, operating businesses (Gateway Foods, Hawaiian Fragrances, and Paradise Found) received payments from Western Lithographing, Geller Associates, Calmark Mailing or Direct Mail to Robinson's knowledge. However, the funds to finance petitioner's investment *461 in these active, operating businesses were funds transferred to these business operations out of accounts of Western Gateway and the shell corporations. None of the operating companies had a positive cash flow at the time Robinson was associated with them. During the years at issue, petitioner freely used the funds that were deposited into the various bank accounts of his various corporations. When books and records for the corporations were later reconstructed, these funds were reflected in account No. 112, Accounts Receivable. For example, the balances shown as "owing" to Verve on certain dates were as follows: Date
Balance
Increase or (Decrease)
07/31/72
$ 300,040.54
12/31/72
353,505.32
$   53,464.78     06/30/73
* 363,439.09
9,933.77     07/31/73
- 0 -
* (363,852.35)    09/30/73
9,499.50
9,499.50     09/30/73
113,460.00
103,960.50     The reduction of $ 363,852.35 in July 1973 was *462 accomplished by way of a journal entry on July 5, 1973, whereby Verve's account receivable from petitioner was transferred to the books of Western Gateway and was thereafter shown as a receivable from petitioner to Western Gateway. Additionally, as of July 1973, the balance reflected as an account receivable owing from petitioner to Graphics amounted to at least $ 119,716.73. By way of a journal entry on July 8, 1973, this balance was similarly transferred to the books and records of Western Gateway and the petitioner's balance owing to Western Gateway similarly increased. Following these two entries, the books and records of Western Gateway reflected that the petitioner owed it $ 123,982.60. However, Western Gateway's books and records reflected a credit to petitioner on the account balance by way of journal entry on June 3, 1973, in the amount of $ 306,100.59, accomplished by way of petitioners' transferring the house at 4369 Royal Place and the furniture therein to the corporation. The figure assigned to the residence was $ 299,400.93 and the figure assigned to the furniture was $ 59,782.99. The journal entries whereby petitioners reduced the amount of money owing to Western *463 Gateway coincided with the formal transfer of the property from petitioners to Western Gateway by way of an assignment of lease and consent dated June 22, 1973. The Court accords little weight to these books and records, except to show the large amounts of money flowing from the kickbacks and diverted KCI funds. The individuals who set up the books and records (McCulloch, Robinson and Sherry Lusk) had no personal knowledge of the transactions, apart from what petitioner told them. Petitioner's explanations as to the sources of these funds were not truthful. Petitioner paid a substantial portion of his personal and family expenses through his various corporations. Even after Robinson's efforts to "clean the companies up," and the transfer of the Royal Place house to Western Gateway to reduce the amount of receivables "owed" to Western Gateway by petitioner, there still remained a fairly substantial amount "owing" to the corporations. The record as a whole establishes and the Court finds that petitioner essentially ignored the corporate entities except as a means to channel the kickbacks and the diverted KCI funds. The record as a whole establishes and the Court further finds *464 that petitioner's efforts to set up books and records for the corporations and to file tax returns for them occurred only after various investigations were underway. Petitioner's efforts were designed to hide the true nature of the kickbacks and diverted KCI funds that he, his corporations, and, in some instances, his creditors had received. Tax Returns of the Various Shell Corporations
The first Federal income tax return filed for Verve was for the period August 1, 1970 through July 31, 1971. That return reflected gross receipts (commissions) of $ 235,385, taxable income of $ 34,513, and tax liability of $ 10,066. That return listed B.D. Albright (Mrs. Weil) as the secretary-treasurer and owner of 100 percent of the stock. That return reflected a salary paid to Mrs. Weil during that period of $ 18,000 for full-time work. The president of Verve was listed as Lloyd Tucker, who worked part-time and whose compensation was $ 6,000. The vice president was identified as Nicole Eisenberg (the wife of Norman Pinsky) and her compensation was listed as $ 9,600. Verve's initial corporate return listed as an asset $ 55,378 as an account receivable from the stockholders. That *465 initial return was filed January 19, 1972, and the tax liability listed therein was paid. On July 12, 1973, an amended return for the period August 1, 1970 through July 31, 1971, was filed for Verve. The amended return increased the commission income to $ 275,385, instead of the $ 235,385 originally reported, and reduced claimed expenses to eliminate certain personal expenses of petitioners. The amended return reflected a tax liability of $ 32,246, and the additional taxes were ultimately paid. Verve's Federal income tax return for the fiscal year ending July 31, 1972, was filed April 17, 1973. That return reported commission income of $ 339,979. The return listed Mrs. Weil as the president with compensation of $ 16,000. Mrs. Weil's brother-in-law, Harry Hinchey, was listed as the vice president and Margaret Costello as the secretary-treasurer. The return did not reflect as an asset any loans to shareholders. The total tax shown on the return was $ 42,402, which amount was paid. Also, on July 12, 1973, an amended return for the fiscal year ended July 31, 1972, was filed for Verve. The amended return increased commission income to $ 469,864 and again reduced claimed expenses *466 to eliminate certain personal expenses of petitioners. The tax liability was increased to $ 139,599 and this additional $ 97,197 was never fully paid. The amended return reflected that the loans to shareholders had increased from $ 55,378 as of the close of the prior fiscal year to a total of $ 300,041. One further tax return was filed for Verve, covering the period August 1, 1972, through September 30, 1972. That return reflected commission income of $ 98,565, taxable income of $ 63,980, and a tax liability of $ 18,631, which was paid. The return, filed on January 18, 1974, was signed by petitioner as president, but on Schedule E of said return, Mrs. Weil was listed as the president and Margaret Costello as the secretary and treasurer. On depreciation Schedule G of the return, there was reflected the acquisition of a fishing boat in August of 1972, with a cost basis of $ 79,715. The loans to shareholder account balance had increased during the short two-month period to $ 359,510. Graphics was a Delaware corporation incorporated in February 1972. The only income tax return ever filed for Graphics was filed on June 18, 1973, for the period February 8, 1972 through September 30, 1972. *467 The only income reflected on the return was $ 183 of interest income and $ 4,999 of management fees. Harry Hinchey was reflected as the president at a salary of $ 4,800. Loans to stockholders were listed in the amount of $ 36,266. Allison Production was a New York corporation incorporated in November 1970. In June of 1973, a franchise tax report for Allison Production was filed with the State of New York for the year 1972. That report reflected no income earned during that year. The franchise tax report listed total assets of $ 118 as of the end of 1972 and stated that a Federal income tax return, Form 1120, had been filed for Allison Production. The report listed the officers and shareholders as Beatrice D. Albright (Mrs. Weil), Harry Hinchey, and Margaret Costello. No franchise tax report for the year 1973 was ever filed with the State of New York. The only Federal income tax return ever filed for Allison Production was for the year 1972. That return, filed June 18, 1973, reflected zero gross income. Western Gateway was incorporated under the laws of the State of Hawaii in July 1972. An Annual Corporation Exhibit was filed with the State of Hawaii for Western Gateway *468 for the year ending September 30, 1972. That document listed total assets for Western Gateway of $ 50,049 and zero gross income. The nature of the corporate business was reflected as "holding company." An Annual Corporation Exhibit was also filed for the year ending September 30, 1973. Petitioner was listed on that document as the president of Western Gateway. The assets of Western Gateway, as shown on the document, had increased to $ 1,600,791, but total gross income received for the period was reported as $ 11,300. The initial Federal income tax return for Western Gateway for the period July 3, 1972 through September 30, 1972, was not filed until June 18, 1973. That was the only Federal income tax return ever filed for Western Gateway, and that return reflected zero income for the corporation for that period and $ 39,800 in expenses. Western Gateway was more or less a holding company for petitioner's active operating companies and for certain other companies that were not active operating companies. The active operating companies had employees and actually carried on businesses; these included: Paradise Found, Ltd., Gateway Foods, Rainbow Production, and Hawaiian Fragrances. *469 Those active operating companies are not directly involved in this case. The nonoperating, nonactive companies were essentially shells and were little more than petitioner's own incorporated deep pockets; these included: Verve, Graphics, Allison Production, and Western Gateway itself to a large extent. These nonoperating, nonactive companies did not perform any services or carry on any business, but large sums of money were diverted to them by petitioner. Much of this money that was diverted to the shell corporations was never reported in income by either petitioner or his corporations. Some of the money was reported on returns filed for Verve, particularly on amended returns prepared after the various investigations by the SEC, the U.S. Postal Service, and Koracorp were underway. Various Investigations by KCI's Parent Corporation, SEC, and U.S. Postal Service
The KCI unbilled receivables discussed earlier were reflected as assets on KCI's balance sheets, and ultimately on the balance sheets of Koracorp. As of the period ending December 29, 1972, KCI had unbilled accounts receivable in the amount of $ 2,428,593.52. As of August 24, 1973, the figure for unbilled accounts *470 receivable amounted to $ 2,775,693.40. During the summer of 1973, the president of Koracorp requested the Koracorp controller and secretary, Raymond Kittelberger, to ascertain why the cash collections on the accounts receivable at KCI were coming in so slowly. The validity and/or the collectibility of the unbilled accounts receivable, as well as other uncollected accounts receivable, also became the subject of an investigation by the Securities and Exchange Commission (SEC). Shortly after August 8, 1973, a problem developed with respect to the certified audits of Koracorp previously performed by Arthur Anderson. The problem was in connection with KCI's accounts receivable. The SEC conducted an investigation pertaining to these certified audits. The certified audits were incorrect in respect to the previously stated assets, liabilities, and income of KCI, which was directly connected to the validity and/or collectibility of the unbilled accounts receivable, as well as other uncollected accounts receivable. At the time that Raymond Kittelberger commenced his special investigation in the summer of 1973, there were approximately $ 8 million worth of uncollectible receivables on *471 KCI's books. In his investigation, he first encountered the "unbilled accounts receivable," a practice that was theretofore completely unknown to him as controller. The unbilled accounts receivable had a direct effect on the profitability of the parent corporation and resulted in a substantial operating loss when the company had to write off the receivables. The KCI unbilled receivables had had the effect of creating the appearance that the "Homemaking with a Flair" operation was a profitable one, whereas it actually lost money. At a special meeting of the board of directors of KCI held on August 15, 1973, the board asked for and received the resignations of petitioner, Jay Fleischmann, and Norman Pinsky, effective as of August 7, 1973. In early 1973, the U.S. Postal Service was conducting an investigation of Direct Mail, as mentioned earlier. In connection with that investigation, a Postal Inspector came across invoices and checks to petitioner's various companies (Verve, Allison Production, Graphics, and Western Gateway). On April 18, 1973, two Postal Inspectors met with petitioner in Hawaii. Petitioner was asked about each of certain checks, totaling $ 167,000, issued by *472 Direct Mail in 1972 to these companies, specifically asking what each check represented. Petitioner's answer to each of the questions was the same, namely, that the checks represented commissions that he had earned for placing printing for various other firms. Petitioner stated that there was no specific way that he could receive these "commissions" directly, because of a conflict of interest with respect to his position as president of KCI. Accordingly, petitioner stated that he had worked out an arrangement with Direct Mail under which the "commissions" he had earned would first be sent to Direct Mail and then subsequently petitioner would cause one of his companies to send an invoice to Direct Mail and he would then receive his commission when Direct Mail paid the invoice. Petitioner's statements to the Postal Inspectors were untruthful. In fact, the payments represented kickbacks or diversions of KCI's funds to petitioner. Petitioner was also asked about certain payments from Geller Associates and Calmark Mailing, but he refused to answer any questions regarding payments made by those firms. Petitioner was never authorized by Koracorp or KCI to receive for himself, for his *473 companies, or for his creditors any of the monies due KCI in connection with "Homemaking with a Flair." Petitioners' Tax Returns
On their 1971 Federal income tax return, petitioners reported $ 54,499.99 of wage income, $ 35,999.99 paid by KCI to petitioner Louis P. Weil and $ 18,500 paid by Verve to petitioner Beatrice Weil. Petitioners also reported $ 30,000 of commission income and $ 200 of director's fees from unidentified sources. On their 1972 Federal income tax return, petitioners reported wages of $ 56,800, $ 42,000 paid by KCI to petitioner Louis P. Weil and $ 14,800 paid by Verve to petitioner Beatrice Weil. The return also reflected the receipt of $ 24,500 of commission income and a rental loss of $ 48,064.76 with respect to the Royal Place property. On his 1972 income tax return, petitioner reported only $ 17,500 of the $ 42,500 in commissions paid to him by Geller Associates. That was the erroneous figure shown on the Form 1099 issued to him by Geller Associates. Petitioners' 1971 and 1972 income tax returns were prepared by the CPA firm of Lester Witte & Co. in San Francisco, California. All of the income information contained in those returns was *474 provided to employees of Lester Witte & Co. by petitioner Louis P. Weil. For 1972, he prepared a summary sheet identifying the items of income and expense and identifying $ 17,500 of the commission income as coming from Geller Associates. Petitioners' 1973 income tax return was filed with the Internal Revenue Service late on May 20, 1976. The return reported $ 49,375 in wages, $ 25,375 paid to petitioner Louis P. Weil by KCI and $ 24,000 paid to Beatrice Weil by Verve. The return also reflected commission income paid by Geller Associates of $ 15,000. During 1973, petitioner received wage (Form W-2) income from KCI in the amount of $ 25,375 and miscellaneous (Form 1099) income from KCI in the amount of $ 50,500. The appropriate Forms W-2 and 1099 were issued to him by KCI, both showing his address as 1221 Jones Street, San Francisco, California 94109. The Form W-2 was attached to petitioner's income tax return for 1973 when it was filed in 1976. The income represented by the Form 1099 was not reported on that 1973 income tax return. Petitioners' 1973 income tax return was prepared by Leonard Mednick, a CPA in Honolulu, Hawaii. The return was prepared sometime immediately *475 preceding March 31, 1976, and the information contained in the return was provided to him by petitioner Louis P. Weil. Although petitioner Louis P. Weil provided the CPA with the Form W-2 issued by KCI reflecting gross wages of $ 25,375, he did not provide the CPA with the Form 1099 issued by KCI, reflecting payment of miscellaneous income in the amount of $ 50,500. Other Unreported Income
In addition to the payments to petitioner's companies set forth in the statutory notice of deficiency, the reconstructed books and records of Verve and/or Western Gateway reflect the receipt of additional amounts of commission income as follows: 1971
Date
Amount
Received
Received From
$    293.60
08/20/71
U.S. Sales Co.
10,000.00
08/31/71
Western Lithographing
20,000.00
09/18/71
Geller Associates
10,000.00
09/29/71
Western Lithographing
40,000.00
10/16/71
Geller Commonwealth
of P.R.
16,800.00
11/01/71
Western Lithographing
761.55
12/20/71
U.S. Sales Co.
978.39
12/20/71
U.S. Sales Co.
$ 98,833.54
1972
Date
Amount
Received
Received From
$  1,263.09
02/  /72
U.S. Sales Co.
5,000.00
02/26/72
Geller Associates
5,000.00
02/26/72
Geller Associates
17,000.00
04/  /72
Dow/Direct Mail
6,100.00
04/29/72
Perry Printing
6,100.00
06/  /72
Perry Printing
3,600.00
07/  /72
Perry Printing
6,400.00
07/  /72
Perry Printing
3,586.02
07/  /72
U.S. Sales Co.
6,581.48
07/  /72
De Barry Co.
$ 60,630.59
1973
Date
Amount
Received
Received From
$ 20,000
01/31/71
Shelby Lithographing Co.
20,000
01/15/73
Direct Mail
20,000
01/15/73
Direct Mail
$ 60,000
*476 Additional payments from Geller Associates that were not included in the statutory notice are as follows: Check No.
Date
Payee
Amount
9204
01/31/71
Verve
$ 10,000
9442
03/15/71
P. Weil
1,232
10075
06/03/71
B. Albrecht (Mrs. Weil)
10,000
12010
02/22/72
Verve
10,000
14062
10/25/72
Allison Production
12,500
Respondent has not sought any increased deficiencies in regard to these payments. ULTIMATE FINDINGS OF FACT 1. Petitioners omitted substantial amounts of income from their tax return for each of the years before the Court. 2. The omitted income each year represented some commissions earned by petitioner Louis P. Weil, substantial amounts of kickbacks he received from companies doing business with KCI, and substantial amounts of KCI's monies that he caused to be diverted from KCI to himself, to his various shell corporations, and in some instances to his own creditors. 3. The omitted income resulted in an underpayment of tax in each year before the Court. 4. The underpayment of tax each year was due to fraud on the part of petitioner Louis P. Weil. OPINION *477 Petitioners bear the burden of showing that respondent's deficiency determinations are incorrect. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Based on the facts set out at length in our Findings of Fact above, petitioners have not carried their burden. [3] In fact the record shows more unreported income each year than respondent determined. *478 Respondent, on the other hand, has the burden of establishing by clear and convincing evidence the elements of fraud for the section 6653(b) addition. Sec. 7454; Rule 142(b); Zack v. Commissioner, 692 F.2d 28 (6th Cir. 1982), affg. a Memorandum Opinion of this Court, cert. denied 460 U.S. 1084 (1983); Stone v. Commissioner, 56 T.C. 213, 220 (1971). Those elements are (1) the existence of an underpayment of tax for each year and (2) that some part of that underpayment of tax each year was due to fraud on the part of petitioner Louis P. (Phillip) Weil (hereinafter "petitioner"). Fraud is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Candela v. United States, 635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied. 393 U.S. 1020 (1969). Respondent must show that the taxpayer intended *479 to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent collection of such taxes. Stoltzfus v. United States, supra. Fraud is a factual question to be determined on the basis of the entire record, and since there seldom is direct proof of the taxpayer's intention, the taxpayer's entire course of conduct must be considered and fraudulent intent can be established by circumstantial evidence. Spies v. United States, 317 U.S. 492 (1943); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Gajewski v. Commissioner, 67 T.C. 181, 199-200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Based on the record as a whole, as detailed in our Findings of Fact above, we conclude that respondent has proved fraud each year by clear and convincing evidence. Each year there was a substantial omission of taxable income, resulting in a substantial underpayment of tax each year. Petitioner failed to report certain commissions he earned. He also failed to report substantial amounts of kickbacks and diversions of KCI's *480 funds that he received from companies doing business with KCI. In his position as president of KCI and being responsible for publication of "Homemaking with a Flair," petitioner caused the suppliers of advertising, mailing, printing, and other services to divert monies belonging to KCI to himself, to his shell corporations, or to his own creditors. Such a pattern of consistent and substantial understatement of income is, by itself, strong evidence of fraud. Cefalu v. Commissioner, 276 F.2d 122, 129 (5th Cir. 1960); Marcus v. Commissioner, 70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). Income from illegal activities and sources such as kickbacks and improper diversions of his employer's funds (akin to embezzlement or theft) is of course taxable income. James v. United States, 366 U.S. 213 (1961). That petitioner was in effect stealing from his employer is indicative of his fraudulent intent. *481 As we said in McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), another case involving a scheme to swindle and defraud the taxpayer's employer: it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax. * * *
And petitioner did misrepresent and conceal his receipt of KCI's funds. Contrary to his arguments on brief, petitioner knew that neither he nor his shell corporations had performed any services or earned this money from Direct Mail, Geller Associates, Western Lithographing, etc. Moreover, he did not report the income on his own returns or on the tax returns of his shell corporations. Petitioner told the U.S. Postal Inspectors that the payments from Direct Mail were really commissions he had earned that he could not receive directly because of a conflict of interest in his position as president of KCI. However, he did not report that income on his tax returns as commission income either. Moreover, *482 petitioner's statements to the Postal Inspectors were false. He knew he was receiving kickbacks and funds that belonged to KCI and that he had caused these funds to be diverted to himself, to his shell corporations, or in some instances to his creditors. Petitioner also failed to maintain proper books and records, another indicium of fraud. Bradford v. Commissioner, supra, 796 F.2d at 307-308; Lollis v. Commissioner, 595 F.2d 1189, 1192 (9th Cir. 1979), affg. a Memorandum Opinion of this Court. Petitioner's attempt to "reconstruct" books and records and file delinquent and/or amended tax returns for his various shell corporations was undertaken after the investigations by the Postal Service, the SEC, and KCI's parent corporation were underway. The Court is satisfied that the purported reconstruction of books and records was just another attempt to conceal the kickbacks and diversions of KCI's funds. This reconstruction was a transparent effort by petitioner to assign his income to his shell corporations ( Lucas v. Earl, 281 U.S. 111 (1930)), *483 and to try to give verisimilitude to his false statements as to the sources of the unreported income. Petitioner used his shell corporations as his own deep pockets and used the funds funneled to them to pay his own gambling debts at Caesar's Palace in Las Vegas, Nevada, to buy a Maserati automobile, to buy a home in Honolulu, Hawaii, and to pay personal, family, and living expenses including expenses for the family maid and Mrs. Weil's clothes. He also used the unreported and untaxed funds to invest in other businesses -- Hawaiian Fragrances, Paradise Found, and Gateway Foods. The evidence in the record in this case is exceedingly detailed. Reviewing and weighing this evidence requires painstaking attention to complex banking and accounting records to trace the various funds, to unravel the convoluted money trail, and to untie the Gordian knot of petitioner's after-the fact "reconstruction" of accounting books and records. However, when the tangled skein is unwound, there is a pervasive pattern of tax evasion. The civil fraud penalty is intended to reimburse the Government for the lost revenue and heavy expense of investigating just this type of case. Helvering v. Mitchell, 303 U.S. 391, 401 (1938). *484 The Court is aware that petitioner was acquitted in the criminal tax evasion case. However, there is an important difference between the standard of proof in a criminal tax fraud case (beyond a reasonable doubt) and that in a civil tax fraud case (clear and convincing evidence). Respondent has carried his burden in this civil tax fraud case. Based on petitioner Louis P. Weils's entire course of conduct, the Court concludes that he intended to evade payment of taxes and that respondent has established such fraudulent intent by clear and convincing evidence. To reflect the above holdings, Decision will be entered under Rule 155. Footnotes
*. Additions to tax determined against petitioner Louis P. Weil only.↩
1. Valerie Price maintained Direct Mail's check register. She was disturbed by this unusual practice of preparing the invoices for services allegedly rendered to Direct Mail. Accordingly, she listed the various checks she wrote in payment of these invoices under the category of "supplies" or "postage" because she wanted to be able to readily find and identify these checks at some future time. Some of these checks included the following: Ck. No.
Date
Payee
Amount
7799
1-31-72
Verve
$ 18,700
7800
1-31-72
Allison Production
11,300
8130
4-03-72
Verve
17,975
8131
4-03-72
Allison Production
16,025
8837
9-27-72
Graphics
42,000
9169
11-25-72
Western Gateway
33,000
The invoice for which check 7799 was issued listed the services rendered as "Hand Inserting and Folding." When the U.S. Postal Service later investigated Direct Mail for defrauding the Government, petitioner claimed that check No. 7799 was in payment of a commission he had earned for placing printing with various other firms. Petitioner gave similar explanations to the postal inspector as to the other payments from Direct Mail.↩
2. Mrs. Weil's name was used in many of the transactions in this case, appearing in various combinations or permutations of her maiden name or a stage name she had once used, Beatrice Dolores Albright or Beatrice Albrecht.↩
*. Erroneously reflected on books as $ 363,852.35)↩
3. Apart from the unreported income items, there were two other items -- a travel expense item for 1973 and a rental income item for 1973. Petitioners have not carried their burden as to the travel expense deduction. However, as to the rental item, respondent determined that once petitioners transferred the Royal Place residence to Western Gateway in 1973, they had income equal to the fair rental value of the residence in the amount of $ 21,000. However, the Court has concluded that Western Gateway was just a shell corporation, essentially just another one of petitioner Louis P. Weil's deep pockets. We regard that purported transfer of the residence by way of an assignment of lease and consent as just a part of the window dressing in the "reconstruction" of the books and records of the various shell corporations. Accordingly, we disregard that purported transfer and will not impute income to petitioners for the rental value of the Royal Place residence.↩